**In re LINERBOARD ANTITRUST LITIGATION.**

**MDL No. 1261.**

United States District Court, E.D. Pennsylvania.

Sept. 4, 2001.

As Amended Sept. 10, 2001.

Howard Langer, Sandals & Langer, LLP, Philadelphia, PA, for plaintiff Winoff.

Jeffrey J. Corrigan, Spector, Roseman & Kodroff, Philadelphia, PA, Steven A. Kanner, Much Shelist Fried Denenberg, Ament & Rubenstein, Chicago, IL, for plaintiff General Refractories.

Martin Twersky, Berger & Montague, Philadelphia, PA, for plaintiff Garrett Paper Co.

Allen D. Black, Roberta D. Liebenberg, Fine, Kaplan and Black, Robert Larocca, Kohn Swift & Graf, Philadelphia, PA, for the Box Class.

R. Mark McCareins, Dane A. Drobny, Paul N. Monnin, Winston & Strawn, Chicago, IL, for defendants Jefferson Smurfit, Stone Container, Smurfit–Stone.

Richard Rizzo, Will Sachse, Jennifer R. Clarke, Dechert Price & Rhoads, Philadelphia, PA, for defendant Temple Inland.

Daniel B. Huyett, Stevens & Lee, Reading, PA, Steven C. Seeger, Kirkland & Ellis, Chicago, IL, for defendant International Paper and Union Camp.

Edward M. Posner, Paul H. Saint–Antoine, Isabel C. Lopez, Drinker Biddle & Reath, Philadelphia, PA, for defendant Georgia–Pacific.

Sherry A. Swisrsky, Ralph Wellington, Dianna Litvin, Schnader Harrison Segal &

Lewis, Philadelphia, PA, Barack S. Echols, Douglas Kurtenbach, Timothy A. Duffy, Kirkland & Ellis, Chicago, IL, for defendant Weyerhauser, PCA, Gaylord, Tenneco.

DUBOIS, District Judge.

## MEMORANDUM

I. PROCEDURAL HISTORY ...........................................201

II. BACKGROUND .................................................203

III. STANDARD FOR CLASS CERTIFICATION ............................204

IV. DISCUSSION .................................................205
 A. The Four Elements of Rule 23(a) ...........................205
 1. Numerosity ........................................205
 2. Commonality .......................................205
 3. Typicality ........................................207
 4. Adequacy of Representation .........................207
 a. Lack of Purchases from Non–Stone Defendants .....208
 b. Timing, Location, and Amount of Purchases .......208
 c. Unique Defenses ...............................211
 d. Lack of Knowledge of the Litigation .............212
 e. Lack of Financial Resources ....................213
 B. The Two Elements of 23(b)(3) .............................214
 1. Predominance ......................................214
 a. Plaintiffs' Conspiracy Theory Does Not Preclude Predominance.....214
 b. Common Proof of Impact .........................216
 c. Damages .......................................220
 d. Scope of Classes ..............................220
 e. Class Period ..................................221
 i. Beginning Date ...........................221
 ii. Ending Date ..............................221
 f. Fraudulent Concealment .....222
 2. Superiority .......................................223
 C. Definition of the Classes ...............................224

V. CONCLUSION .................................................224

Presently before the Court are two motions for class certification: Corrugated Sheet Plaintiffs' Motion for Class Certification (Document No. 76, filed January 11, 2001) and supporting Memorandum of Law (Document No. 74, filed January 10, 2001), and Corrugated Box Plaintiffs' Motion for Class Certification (Document No. 75, filed January 10, 2001), and related submissions. Oral argument on the Motions was held on August 8, 2001. For the following reasons, Corrugated Sheet Plaintiffs' Motion for Class Certification will be granted, and Corrugated Box Plaintiffs' Motion for Class Certification will be granted.

## I. PROCEDURAL HISTORY

This is an antitrust case involving allegations that several U.S. manufacturers of linerboard[1] engaged in a continuing combination and conspiracy in unreasonable restraint

---

**1.** Linerboard includes any grade of paperboard suitable for use in the production of corrugated sheets, which are in turn used in the manufacture of corrugated boxes and for a variety of industrial and commercial applications. Corrugated sheets are made by gluing a fluted sheet which is not made of linerboard, known as the corrugating medium, between facing sheets of linerboard; corrugated sheets are also referred to as containerboard. The defendants named in the instant lawsuits are major integrated manufacturers and sellers of linerboard, corrugated sheets, and corrugated boxes.

of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

The price fixing conspiracy that is the subject of this litigation was the focus of a 1998 complaint by the Federal Trade Commission ("FTC") against Stone Container Corporation ("Stone"). The FTC charged Stone with a unilateral violation of Section 5 of the Federal Trade Commission Act. According to the FTC, Stone had attempted to reduce linerboard inventories and had "invite[d]" some of its competitors to join in a "coordinated price increase." The FTC did not allege that any other manufacturer had accepted Stone's "invitation," nor did it allege the existence of any conspiracy. *See In re Linerboard Antitrust Litigation,* 2000 WL 1475559, *1 (E.D.Pa. Oct. 4, 2000).

Stone and the FTC entered into a consent decree. In doing so, Sone did not admit liability for its alleged unilateral misconduct, and the consent decree has no preclusive effect on Stone in this private party action. *Id.*

Soon after the FTC filed its complaint, three lawsuits were filed in the Northern District of Illinois on behalf of purchasers of corrugated sheets ("Sheets Complaint I"): *General Refractories Co. v. Stone Container Corp.,* Civil Action No. 99–1341 (transferred on Mar. 16, 1999 to E.D. Pa.), and originally No. 98 C 3543 (filed June 8, 1998, N.D. Ill.); *Albert I. Halper Corrugated Box Co. v. Stone Container Corp.,* Class Action No. 99–1396 (transferred on Mar. 19, 1999 to E.D. Pa.), and originally No. 98 C 4659 (filed July 28, 1998, N.D. Ill.); and *Crest Meat Co., Inc. v. Stone Container Corp.,* Civil Action No. 99–1397 (transferred on Mar. 19, 1998 to E.D. Pa.), and originally No. 98 C 4612 (filed July 27, 1998, N.D. Ill.). These cases named only Stone as a defendant, but plaintiffs alleged that there were unnamed co-conspirators involved in the antitrust conspiracy, including *inter alia,* Jefferson Smurfit Corp. *See* Sheets Complaint I (all three complaints) at ¶ 9. Together, these plaintiffs are referred to as the Corrugated Sheet Plaintiffs or Sheet Plaintiffs. The Corrugated Sheet Plaintiffs aver in Sheets Complaint I that they were harmed by an industry-wide combination to artificially raise the price of linerboard.

Four other lawsuits were filed against Stone in the Eastern District of Pennsylvania on behalf of purchasers of corrugated boxes in late 1998: *Winoff Industries, Inc. v. Stone Container Corp.,* Civil Action No. 98–5055 (filed Sep. 23, 1998, E.D. Pa.), *Oak Valley Farms, Inc. v. Stone Container Corp.,* Civil Action No. 98–5251 (filed Oct. 2, 1998, E.D. Pa.), *Garrett Paper, Inc. v. Stone Container Corp.,* Civil Action No. 98–5228 (filed Oct. 1, 1998, E.D. Pa.), and *Local Baking Products, Inc. v. Stone Container Corp.,* Civil Action No. 98–5384 (filed Oct. 9, 1998, E.D. Pa.). Together, these plaintiffs are referred to as the Corrugated Box Plaintiffs or Box Plaintiffs. The Corrugated Box Plaintiffs also aver that they were harmed by an industry-wide combination to artificially raise the price of linerboard. The four corrugated box actions in the Eastern District of Pennsylvania were consolidated by stipulation and order dated December 17, 1998 pursuant to Federal Rule of Civil Procedure 42(a).

In late 1998 Stone filed a motion to dismiss Sheets Complaint I—that is, the three lawsuits originally filed against Stone in the Northern District of Illinois on behalf of purchasers of corrugated sheets. On January 8, 1999, Judge Blanche M. Manning of that court denied Stone's motion to dismiss. *See General Refractories Co. v. Stone Container Corp.,* No. 98 C 3543, 98 C 4612 and 98 C 4659, 1999 WL 14498 (N.D.Ill. Jan. 8, 1999). Stone filed a consolidated answer to the three complaints in the Northern District of Illinois on February 5, 1999. Soon thereafter, on February 12, 1999 the Judicial Panel on Multidistrict Litigation transferred the actions pending in the Northern District of Illinois to this Court for all further pretrial proceedings.

On May 14, 1999 the Corrugated Box Plaintiffs filed the First Amended and Consolidated Class Action Complaint ("Corrugated Box Amended Complaint"). Stone and the following "Non–Stone" Defendants were named in the Corrugated Box Amended Complaint: Jefferson Smurfit Corp., Smurfit–Stone Container Corp., International Paper Co., Georgia Pacific Corp., Weyerhaeuser Paper Co., Temple Inland Inc., Gaylord Container Corp., Union Camp Corp., Simpson

Tacoma Kraft Co., Tenneco Inc., Tenneco Packaging, and Packaging Corp. of America. According to the Corrugated Box Amended Complaint, the Non–Stone Defendants accepted Stone's "invitation" to restrict the production of linerboard and artificially raise prices, resulting in an antitrust conspiracy in violation of the Sherman Act.

On May 18, 1999 a separate class action complaint was filed in the Eastern District of Pennsylvania on behalf of purchasers of corrugated sheets ("Sheets Complaint II"). This complaint names eleven of the twelve Non–Stone Defendants identified in the Corrugated Box Amended Complaint.[2] Like the Corrugated Box Amended Complaint, Sheets Complaint II alleges that the named Non–Stone Defendants unlawfully conspired with Stone and each other to artificially raise the price of linerboard.[3]

On September 1, 1999 Stone filed a Motion to Dismiss the Corrugated Box Amended Complaint and for Judgment on the Pleadings with respect to the three complaints collectively referred to as Sheets Complaint I. Also on September 1, 1999, the Non–Stone Defendants filed a Joint Motion to Dismiss the Corrugated Box Amended Complaint and Sheets Complaint II. By Order and Memorandum dated October 4, 2000, these motions were denied. *See In re Linerboard Antitrust Litig.,* 2000 WL 1475559.

By Order dated February 5, 2001, the Court granted the Uncontested Motion of Winoff Industries, Inc. for Voluntary Dismissal, and dismissed all claims of Winoff against all defendants. Similarly, by Order dated February 13, 2001, the Court granted Plaintiff Crest Meat Company, Inc.'s Uncontested Motion for Voluntary Dismissal.

On January 10, 2001, the Corrugated Box Plaintiffs[4] filed their Motion for Class Certification. In their Motion, Box Plaintiffs propose that the Court certify the following class:

> All persons in the United States who purchased corrugated containers directly from any Defendant at any time during the period October 1, 1993 through November 30, 1995, but excluding Defendants, their respective parents, subsidiaries and affiliates and federal, state and local governmental entities and political subdivisions.

On January 11, 2001, the Sheet Plaintiffs[5] filed their Motion for Class Certification. In their Motion, Sheet Plaintiffs propose that the Court certify the following class:

> All individuals and entities who purchased corrugated sheets in the United States directly from any of the defendants during the class period from October 1, 1993 through November 30, 1995, excluding the defendants, their co-conspirators, and their respective parents, subsidiaries, and affiliates, as well as any government entities.

Oral argument on both Motions was held on August 8, 2001.

## II. BACKGROUND

This case is grounded on allegations that defendants conspired to restrict the output of linerboard in order to support increases in the price of linerboard with the objective of increasing the price of corrugated sheets and corrugated boxes. Linerboard is the key component in production cost of corrugated sheets and corrugated boxes, and is the primary determinant of the prices of those items. Corrugated Box Amended Complaint at ¶ 36; Sheets Complaint I (all three com-

---

**2.** Tenneco, Inc. is the sole Non–Stone Defendant that was not named as a party in this complaint.

**3.** One of the defendants named in both the Corrugated Box Amended Complaint and Sheets Complaint II, Simpson Tacoma Kraft Co., was dismissed by agreement of all plaintiffs on November 8, 1999. *See* Stipulation of Dismissal in MDL No. 1261 (Doc. 43, filed Nov. 8, 1999). Thus, eleven Non–Stone defendants remain as parties to the Corrugated Box Amended Complaint, and ten Non–Stone defendants remain as parties to Sheets Complaint II.

**4.** At the time of oral argument, Oak Valley Farms, Inc. ("Oak Valley"), Local Baking Products, Inc. ("Local Baking"), and Garrett Paper, Inc. ("Garrett Paper") remained as Box Plaintiffs.

**5.** At the time of oral argument, General Refractories Co. ("General Refractories") and Albert O. Halper Corrugated Box Co. ("Halper") remained as Sheet Plaintiffs.

plaints) at ¶ 20; Sheets Complaint II at ¶ 31.[6] According to plaintiffs, as the cost of linerboard rises, the price of corrugated sheets and boxes rises.

By way of background, plaintiffs allege that in the early 1990s, Stone and other defendants were experiencing financial difficulties. Corrugated Box Amended Complaint at ¶ 38; Sheets Complaint I (all three complaints) at ¶ 23; Sheets Complaint II at ¶ 34. In early 1993. Stone unsuccessfully attempted to increase the price of linerboard, Corrugated Box Amended Complaint at ¶ 39, as part of an overall effort to increase the price of corrugated sheets and containers. Sheets Complaint II at ¶ 35. Plaintiffs allege that Stone believed the failure of that price increase resulted from excess inventory of linerboard, creating a substantial industry-wide imbalance of supply over demand. Corrugated Box Amended Complaint at ¶ 40; Sheets Complaint II at ¶ 35.

According to plaintiffs, Stone devised a strategy to invite its competitors to increase the price of linerboard. As part of this strategy, Stone planned to take downtime at its plants to reduce its production and inventory of linerboard substantially, and contemporaneously to purchase substantial amounts of linerboard from competitors—actions which, plaintiffs allege, were extraordinary, and not in the regular course of business. Corrugated Box Amended Complaint at ¶ 41, Sheets Complaint I (all three complaints) at ¶ 27; Sheets Complaint II at ¶ 37(c).

In mid–1993, Stone advised its competitors that it intended to take linerboard mill downtime and draw down industry inventory levels of linerboard, and stated its belief that these actions would support a price increase. Plaintiffs aver that the purpose of Stone's communications with other manufacturers was to coordinate industry-wide restrictions on output and price increases. Thereafter, on July 7, 1993, Stone announced that it was taking downtime of approximately 180,000 tons of containerboard [linerboard plus medi-

um] by shutting six of its mills for varying periods of time.[7] Ex. E to Corrugated Box Plaintiffs' Motion for Class Certification. Shortly thereafter, "other industry companies followed and up to 500,000 tons were announced to be removed." Ex. F to Corrugated Box Plaintiffs' Motion for Class Certification. As a result of these communications, the major manufacturers of linerboard began to take production downtime at a time when demand in the industry was increasing. Corrugated Box Amended Complaint at ¶¶ 42–45; Sheets Complaint II at ¶¶ 37(d)–(f).

In August 1993, Stone implemented the first of a series of price increases for linerboard which was joined by virtually every major manufacturer. Plaintiffs aver that subsequently, pursuant to an understanding, the major manufacturers continued their pattern of taking substantial downtime and implementing price increases.

The concerted actions of the defendants in taking downtime at the mills producing linerboard, and then increasing the price of linerboard, resulting in price increases for corrugated sheets and corrugated boxes, forms the basis of the conspiracy at issue in this case. As a result of this conspiracy, plaintiffs claim that prices for linerboard, corrugated sheets and corrugated containers were artificially raised, fixed, and stabilized. Corrugated Box Amended Complaint at ¶¶ 47–50, 52; Sheets Complaint I at ¶¶ 27–28; Sheets Complaint II at ¶ 37(i). During the proposed class period, it is alleged that there were at least seven coordinated price increases of corrugated sheets. Sheets Complaint II at ¶ 37(j).

### III. STANDARD FOR CLASS CERTIFICATION

A class action suit is appropriate when the "issues involved are common to the class as a whole." *Califano v. Yamasaki*, 442 U.S. 682, 701, 99 S.Ct. 2545, 2557, 61 L.Ed.2d 176 (1979). Under those circumstances, the certification of a class may both promote judicial economy and save resources for parties who may otherwise repeatedly litigate the same issue. *See id.*

---

6. The Court notes that the Corrugated Box Amended Complaint, Sheets Complaint I, and Sheets Complaint II contain substantially similar allegations. For completeness, citations will be to all Complaints, where appropriate.

7. Defendants concede that the downtime was taken at mills producing linerboard.

For the Court to certify a plaintiff class, plaintiffs must satisfy the four prerequisites for a class action set forth in Federal Rule of Civil Procedure 23(a) and the requirement of Rule 23(b)(3).

The four elements of Rule 23(a) are:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). These four elements are often referred to as " 'numerosity', 'commonality', 'typicality', and 'adequacy of representation,' respectively." *See Hanrahan v. Britt*, 174 F.R.D. 356, 361 (E.D.Pa.1997). " '[C]ommonality' like 'numerosity' evaluates the sufficiency of the class itself, and 'typicality' like 'adequacy of representation' evaluates the sufficiency of the named plaintiff[s] . . . ." *Hassine v. Jeffes*, 846 F.2d 169, 176 n. 4 (3d Cir.1988).

Plaintiffs must also establish that the putative class action meets the requirements of Rule 23(b)(3):

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

## IV. DISCUSSION

### A. The Four Elements of Rule 23(a)

#### 1. *Numerosity*

Satisfaction of the first prerequisite, numerosity, does not require evidence of the exact number or identification of the members of the proposed class, but rather that the proposed class is so "numerous that joinder of all members is impracticable." *See Hanrahan*, 174 F.R.D. at 362 (citing Fed. R.Civ.P. 23(a)(1)). In determining whether a proposed class meets the numerosity requirement, "a court may accept common sense assumptions." *In re Cephalon Securities Litigation*, 1998 WL 470160, *2 (E.D.Pa. Aug. 12, 1998).

Both Box Plaintiffs and Sheet Plaintiffs maintain that while the exact number of putative class members cannot be ascertained at the present time, there are thousands of potential class members so numerous and geographically dispersed that joinder of all members is impracticable. Corrugated Box Amended Complaint at ¶ 28; Sheets Complaint I at ¶ 11; Sheets Complaint II at ¶ 22. Defendants have not disputed that the classes meet the numerosity requirement. The Court concludes based on the evidence presented that the plaintiffs' proposed classes meet the numerosity requirement of Rule 23(a)(1).

#### 2. *Commonality*

Rule 23(a)(2) requires the existence of questions of law or fact common to the class. This requirement is easily met because it may be fulfilled by a single common issue. *See Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir.1994). "Courts interpreting the commonality requirement in the antitrust area have held that 'allegations concerning the existence, scope and efficacy of an alleged conspiracy present questions adequately common to class members to satisfy the commonality requirement.' " *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 478 (W.D.Pa.1999) (citing 4 Hubert Newberg and Alba Conte, *Newberg on Class Actions*, § 18.05, at 18–15 (3d ed.1992)). *See, e.g., Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3d Cir.1977) ("The district was correct in concluding that this question [existence of a conspiracy] is one common to the class."); *In re Corrugated Container Antitrust Litig.*, 80 F.R.D. 244, 247 (S.D.Tex.1978). In this case

plaintiffs will be required to establish the existence of a conspiracy to fix, raise, maintain and stabilize the price of linerboard. *See In re Fine Paper Antitrust Litig.,* 82 F.R.D. 143, 150 (E.D.Pa.1979).

The Sheet Plaintiffs have identified eight questions of law and fact common to all members of the Sheet Plaintiffs' class:

(a) whether the defendants and their co-conspirators engaged in a combination or conspiracy to raise, fix, maintain and stabilize prices of corrugated sheets sold in the United States;

(b) the duration and extent of the alleged combination or conspiracy;

(c) whether the defendants and their co-conspirators were participants in the alleged combination or conspiracy;

(d) whether the alleged combination or conspiracy violated Section 1 of the Sherman Act;

(e) whether the defendants and/or their co-conspirators took affirmative steps to conceal the alleged combination or conspiracy;

(f) the effect of the alleged combination or conspiracy upon the prices of corrugated sheets sold in the United States during the proposed class period;

(g) whether the conduct of the defendants and their co-conspirators, as alleged in Sheets Complaint I and Sheets Complaint II, caused injury to the business or property of the named plaintiffs and the other members of the proposed class; and

(h) the appropriate measure of damages sustained by the named plaintiffs and other members of the proposed class.

Sheets Complaint I (all three complaints) at ¶ 14; Sheets Complaint II at ¶ 25.

The Box Plaintiffs have identified nine questions of law and fact common to all members of the Box Plaintiffs' class, similar in substance to those of the Sheet Plaintiffs:

(a) whether defendants conspired with each other, other co-conspirators, and others to fix, raise, stabilize or maintain the prices for linerboard;

(b) the scope and extent of the conspiracy;

(c) whether the alleged conspiracy to fix the price of linerboard had an effect on prices paid by members of the proposed class for corrugated containers during the proposed class period;

(d) the identity of each member of the alleged conspiracy;

(e) the time period during which the conspiracy existed;

(f) whether defendants' alleged combination, agreement or conspiracy violated Section 1 of the Sherman Act;

(g) whether Box Plaintiffs and other members of the proposed class are entitled to declaratory or injunctive relief;

(h) the appropriate measure of damages sustained by the named plaintiffs and other members of the proposed class; and

(i) whether defendants and their co-conspirators affirmatively and fraudulently concealed the alleged conspiracy.

Corrugated Box Amended Complaint at ¶ 32.

"Antitrust, price-fixing conspiracy cases, by their nature, deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy." *In re Sugar Indus. Antitrust Litig.,* 73 F.R.D. 322, 335 (E.D.Pa.1976). Whether defendants participated in the actions alleged is a common question. *See, e.g., Hanrahan,* 174 F.R.D. at 363 (whether defendants, *inter alia,* systematically made fraudulent misrepresentations or negligent misrepresentations in connections with the promotion of distributorships is common question); *In re Sugar Indus.,* 73 F.R.D. at 335–36 (whether defendants, *inter alia,* "combined and conspired to establish artificially the basis price and effective selling price of refined sugar" is a common question). Further, defendants have not disputed that plaintiffs can establish the commonality requirement.

Considering all of plaintiffs' allegations, the Court concludes there are significant questions of law and fact common to both classes. Thus the commonality requirement is met.

### 3. *Typicality*

■ Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "Typicality asks whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Baby Neal,* 43 F.3d at 55. In evaluating typicality, the Court should consider whether "the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Eisenberg,* 766 F.2d at 786. A finding of typicality will generally not be precluded even if there are "pronounced factual differences" where there is a strong similarity of legal theories. *See, e.g., In re Resource America Sec. Litig.,* 202 F.R.D. 177 (E.D.Pa.2001); *In re Cephalon Sec. Litig.,* 1998 WL 470160, at *2 (citing *Baby Neal,* 43 F.3d at 58). "In antitrust disputes '[s]ince the representative parties need prove a conspiracy, its effectuation, and damages therefrom—precisely, what the absentees must prove to recover—the representative claims can hardly be considered atypical.'" *In re Sugar Indus.,* 73 F.R.D. at 336 (quoting *Minnesota v. United States Steel Corp.,* 44 F.R.D. 559, 567 (D.Minn. 1968)). Moreover, "in instances wherein it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members." *In re Catfish Antitrust Litig.,* 826 F.Supp. 1019, 1035 (N.D.Miss.1993).

In the case before the Court, plaintiffs' claims arise from the same allegedly illegal practices and course of conduct that underlie the claims of the proposed classes, namely, defendants' conspiracy to raise, fix, maintain or stabilize prices for linerboard by reducing production and, as a necessary result, to raise, fix, maintain or stabilize prices for corrugated sheets and containers. In their Joint Memorandum of Law in Opposition to the Corrugated Sheet and Corrugated Box Plaintiffs' Motions for Class Certification, defendants do not directly challenge the typicality prong. Rather, in challenging the third prong, adequacy of representation, they note that "the final three requirements of Rule 23(a) 'tend to merge,' with commonality and typicality 'serv[ing] as guideposts for determining whether ... maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 337 (4th Cir.1998) (quoting *General Tel. Co. v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370, 72 L.Ed.2d 740 (1982)) (alterations in original).

Where appropriate, the Court will consider defendants' arguments with respect to typicality when it considers the adequacy prong. Suffice it to say at this point in this Memorandum that the Court concludes the factual circumstances and legal claims of the named plaintiffs will not significantly differ from the claims of the other members of the proposed classes. Therefore, the typicality prong is satisfied.

### 4. *Adequacy of Representation*

The adequacy of the class representative is dependant on satisfying two factors: 1) that the plaintiffs' attorney is competent to conduct a class action; and 2) that the class representatives do not have interests antagonistic to the interests of the class. *See In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 800–01 (3d Cir.1995); *Rendler v. Gambone Bros. Dev. Co.,* 182 F.R.D. 152, 159 (E.D.Pa.1998); *In re Resource America Sec. Litig.,* 202 F.R.D. 177. Defendants do not challenge the qualifications of plaintiffs' counsel and the Court finds them to be well qualified. Defendants do, however, argue that the named plaintiffs are not adequate class representatives for a variety of reasons. Insofar as these arguments impact the predominance requirement of Rule 23(b)(3), the Court recognizes that

the standards for measuring the predominance of common issues under Fed. R.Civ.P. 23(b)(3) should not be imputed to adequacy of representation. That is to

say, the reasons for denying certification under the predominance standard may not necessarily compel denying certification under 23(a)(4), because the predominance requirement is more stringent than commonality and typicality.

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 185–86 (3d Cir. 2001) (footnotes omitted). The Court will address each argument in turn.

### a. Lack of Purchases from Non–Stone Defendants

■ Defendants argue that, with only one exception, since no named plaintiff purchased any corrugated products during the proposed class period from any defendant other than Stone, the named plaintiffs have no incentive to pursue the claims of those potential class members who purchased from the Non–Stone Defendant manufacturers.[8] Specifically, defendants note that of the named plaintiffs, the only purchases made from a Non–Stone Defendant were Garrett Paper's purchases of pizza boxes from Gaylord Container Corp during the first five weeks of the proposed class period. *See* Affidavit of Professor Franklin M. Fisher, filed March 2, 2001 ("Fisher Aff."), Exs. 7, 8. They argue that because the plaintiffs, for the most part, only purchased from Stone, they have no reason to develop and prove a case against any of the other defendants.

Plaintiffs state in response that they need not have purchased from all defendants to satisfy the adequacy requirement, and the Court agrees. In *Bogosian,* the Third Circuit held that the "fact that a customer has not made purchases from every co-conspirator does not prevent him from suing all—for each co-conspirator contributed to the charging of the supracompetitive price paid by the purchaser." *Bogosian,* 561 F.2d at 448. In fact, because antitrust law "provides for joint and several liability of co-conspirators, each

Plaintiff will have an equal incentive to generally prove the Defendants' participation in the alleged conspiracy." *In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. 493, 519 (S.D.N.Y.1996). Since plaintiffs are alleging a conspiracy to restrict the supply of linerboard, resulting in increases in the prices of linerboard and corrugated products, they must necessarily show that Stone conspired with the other defendants. *See, e.g., United States v. McGlory,* 968 F.2d 309, 321 (3d Cir.1992) (the elements of conspiracy are "a 'unity of purpose,' intent to achieve a common goal, and an agreement to work together toward that goal") (citing *United States v. Wexler,* 838 F.2d 88, 90–91 (3d Cir.1988)).

Accordingly, the Court concludes that plaintiffs have an incentive to prove a case against all defendants. It is in plaintiffs' interest to maximize potential recovery against all defendants and to demonstrate the full extent of the alleged conspiracy.

### b. Timing, Location, and Amount of Purchases

■ Defendants argue that the timing of the named plaintiffs' purchases distort their incentives in pursuing the case. On that issue they say that because not all of the plaintiffs made purchases during the entire proposed class period, plaintiffs' incentives to pursue the case will be antagonistic to each other, and to other potential class members. In essence, defendants contend that each plaintiff will want to show that the period in which it purchased corrugated products was the period most effected by the conspiracy. They argue that an individual plaintiff has no incentive to show that the conspiracy had any effect on a time period in which it did not purchase corrugated products.

Specifically, defendants point to the following evidence of purchases by the Box Plaintiffs: Local Baking did not purchase any

---

8. Insofar as this argument relates to the typicality of plaintiffs' claims, the defendants' arguments are not persuasive.

The fact that the purchases were not made from all of the defendants, or that all of the methods through which the conspiracy was allegedly effected were not utilized against the named plaintiffs is not dispositive of their ability to represent the class. Nor will differing damages, resulting from varied methods of procuring and purchasing the product, defeat satisfaction of Rule 23(a)(3).

*In re Potash Antitrust Litig.,* 159 F.R.D. 682, 691 (D.Minn.1995) (quoting *In re Workers' Compensation,* 130 F.R.D. 99, 106 (D.Minn.1990)) (internal citations and quotations omitted).

products from Stone between September 1993 and May 1994. Oak Valley made no purchases in the first five months of the proposed class period.[9] Garrett Paper made most of its purchases after the "critical initial months" of the alleged conspiracy.[10] As to the Sheet Plaintiffs, defendants argue that General Refractories made no purchases after May 1994 and Halper stopped purchasing from Stone in 1995.

Plaintiffs contend that defendants allegations and evidence do not make the interests of the named plaintiffs antagonistic to the interests of each other or the proposed classes, and the Court agrees. It is well settled that a named plaintiff need not have made purchases from the defendants throughout the class period. *See, e.g., Paper Sys. Inc. v. Mitsubishi Corp.,* 193 F.R.D. 601, 610 (E.D.Wis.2000) (certifying class in an antitrust price-fixing action against the sellers of heat-sensitive facsimile paper where one of three named plaintiffs purchased thermal facsimile paper from defendants for part of the class period); *In re Wirebound Boxes Antitrust Litig.,* 128 F.R.D. 268, 269–70 (D.Minn.1989) (certifying 28–year class period where four of five named plaintiffs did not purchase boxes throughout the entire class period). Moreover, there is evidence that some of the plaintiffs did in fact purchase from Stone throughout the entire class period. *See* notes 9 & 10, *supra.* To the extent that these issues involve disputed issues of fact, the Court will address them at an appropriate time later in the proceedings. *See In re Glassine and Greaseproof Paper Antitrust Litig.,* 88 F.R.D. 302, 304 & n. 1 (E.D.Pa.1980).

Defendants also argue that the geographical location of plaintiffs' purchases makes the named plaintiffs unrepresentative of the proposed classes. They contend that, since plaintiffs have provided no evidence that prices for corrugated sheets and boxes were uniform across the country, or that they were immune from local-market forces that would mitigate or eliminate any impact from defendants' alleged actions, and with the exception of General Refractories, plaintiffs' purchases were made in local markets, plaintiffs have no reason to press claims on behalf of purchasers in other areas of the country. Moreover, defendants argue that the named plaintiffs are unrepresentative of the proposed classes because, unlike the named plaintiffs which were spot purchasers, many class members purchased corrugated products under long term contracts.

The plaintiffs produced evidence at oral argument—two charts from Dr. John C. Beyer's expert report dated January 9, 2001—that regional prices for corrugated products, while not identical, followed very similar price movements. *See* Affidavit of John C. Beyer, Ph.D., Regarding Class Certification, dated Jan. 9, 2001, attached to Corrugated Box Plaintiffs' Motion for Class Certification ("Beyer Aff.") charts 1 & 3. Otherwise stated, when prices for linerboard and corrugated products increased in one area of the country, they went up in the rest of the country as well. This regional differentiation in pricing does not cause plaintiffs to have interests antagonistic to members of the classes from different regions—they still have the same incentives to prove a nation-wide conspiracy.

It is not clear from defendants' submissions just how they conclude the amount of plaintiffs' purchases impact on this class certification decision. At one point, defendants say that they "do not challenge the right of a small, local purchaser to bring a case." They then argue that "it is not fair to the members of the proposed class, or to Defendants for that matter, to allow companies that purchased a smattering of the relevant products at various times over a 25–month period from one Defendant to litigate claims on behalf of

---

**9.** *Plaintiffs submitted a computer printout showing Oak Valley made multiple purchases from Stone between October 1, 1993 and February 28, 1994, the first five months of the proposed class period. Ex. Q, attached to Box Plaintiffs' Reply Memorandum in Support of Class Certification (Doc. 90).*

**10.** *Defendants submitted a chart which shows that Garrett Paper purchased $25,085 worth of boxes from Stone between October 1, 1993 and December 31, 1993, $67,248 worth of boxes from Stone in 1994, and $20,397 worth of boxes from Stone from January 1, 1995 to November 30, 1995. Fisher Aff. Ex 6. This evidence runs counter to defendants' contentions concerning the timing of Garrett Paper's purchases.*

thousands of companies whose purchases, and hence their interests in recovering on claims against Defendants, do not resemble those of the named plaintiffs." Defendant's Joint Memorandum of Law in Opposition (Document No. 85) at 11–12. Regardless, the Court concludes that the amount of plaintiffs' purchases does not make plaintiffs inadequate representatives.

In *Hedges Enterprises, Inc. v. Continental Group, Inc.*, 81 F.R.D. 461 (E.D.Pa.1979), the court allowed a relatively small purchaser of consumer bags to represent a class consisting primarily of "Fortune 500" companies, which purchased large quantities of consumer bags. 81 F.R.D. at 466. It is "generally recognized that 'the mere fact that a representative plaintiff stands in a different factual posture is not sufficient to refuse certification ... [t]he atypicality or conflict must be clear and must be such that the interests of the class are placed in significant jeopardy.' " (citing *Sley v. Jamaica Water & Util., Inc.*, 77 F.R.D. 391, 394–95 (E.D.Pa.1977)) (modifications in original). *See also In re Glassine*, 88 F.R.D. at 304 ("defendants' argument that their claims are not typical of those of purchasers of large volumes of non-standardized products is not convincing"). There is nothing in the record before the Court related to the allegedly small amount of purchases made by the named plaintiffs in comparison to the large amount of purchases by other companies which comprise the proposed classes that would suggest any conflict or that the interests of the classes would in any way be jeopardized.

Defendants rely on *In re Milk Products Antitrust Litigation*, 195 F.3d 430 (8th Cir. 1999) for the proposition that a named plaintiff is not an adequate representative when, *inter alia*, it made only small purchases at list prices, where the purported class included larger purchasers which bought on different terms. In that case, Rainy Lake One Stop, Inc. ("Rainy Lake"), a small convenience store located in northernmost Minnesota, sought to be the sole class representative in a state-wide suit alleging price-fixing of milk. *See id.* at 432–35. The Eighth Circuit affirmed the denial of class certification for two reasons—lack of standing and

failure of Rainy Lake to meet the typicality and adequacy requirements of Rule 23. *See id.* at 436–37. In so holding the court noted with respect to typicality and adequacy that there was evidence of three regional milk markets in Minnesota, and that any evidence of a conspiracy in the geographic area in which Rainy Lake was located would not necessarily translate into evidence of a conspiracy in other regions of the state. *See id.* at 436. Secondly, because Rainy Lake only made small wholesale purchases at list price, there were questions as to whether it had a sufficient incentive to represent class members whose purchases were made at "cost-plus formula prices unrelated to defendants' list prices." *Id.* at 437. Thirdly, Rainy Lake lacked the desire to vigorously pursue the interests of other class members as it only sought to represent small convenient stores, rather than "very large grocery stores" and "convenience store chains." *Id.* None of these factors by themselves were determinative; rather, in addition to Rainy Lake's lack of standing, the Eighth Circuit held that taken as a whole, these factors defeated typicality and adequacy.

The case at bar does not present the same obstacles to class certification that were faced in *In re Milk Products*. First, the named plaintiffs are from multiple locations throughout the country—among the Box Plaintiffs, Oak Valley is a South Dakota corporation with its principal place of business in Watertown, South Dakota, Corrugated Box Amended Complaint ¶ 7, Garrett Paper is a Missouri corporation with it principal place of business in St. Louis, Missouri, *id.* at ¶ 7, and Local Baking is a New Jersey corporation with its principal place of business in Newark, New Jersey, *id.* at ¶ 9, and, among the Sheet Plaintiffs, General Refractories is a Pennsylvania corporation with its principal place of business in Bala Cynwyd, Pennsylvania, Sheets Complaint II ¶ 5, and Halper is a Minnesota corporation with its principal place of business located in Minnesota, *id.* at ¶ 6. They can adequately present claims of a nationwide conspiracy, and have incentives to do so.

Additionally, the problem that some plaintiffs made "spot" purchases while other

members of the proposed classes had long term contracts can be remedied by changing the definition of the classes to exclude purchasers who had contracts which could not have been affected by the alleged conspiracy—purchasers with contracts not tied to the price of linerboard.[11] Finally, plaintiffs have shown an interest in vigorously pursuing the claims of all effected parties, in contrast to Rainy Lake, the plaintiff in *In re Milk Products.*

Moreover, many courts have certified classes akin to the proposed classes in this case. For example, the court in *In re Corrugated Container Antitrust Litigation,* 80 F.R.D. 244 (S.D.Tex.1978) certified a class consisting of all persons who "purchased corrugated containers or corrugated sheets," *id.* at 245, even though they "tend to be made and sold in small geographical areas [and] . . . . [c]osts of labor, paper, energy, etc., vary from one area to another, so that the final cost of the same box may vary from one part of the country to another." *Id.* at 246. In certifying a class in *In re Glassine and Greaseproof Paper Antitrust Litigation,* the court concluded that there is no "significance in the fact that plaintiffs purchased at list prices, whereas volume buyers negotiated their prices. Plaintiffs allege that prices were set at non-competitive levels: such market conditions would affect the prices paid by both types of purchasers, and their interests would be congruent." 88 F.R.D. at 305. Likewise, the Third Circuit, in *Bogosian,* found two local gasoline dealers appropriate representatives for a class of thousands of dealers of sixteen companies disbursed throughout the United States. *See* 561 F.2d at 449.

■ The named plaintiffs are not inadequate class representatives because of the timing, location, and amount of their purchases. They do not have interests antagonistic to each other or to the proposed classes; rather, as they must offer common proof to establish the conspiracy, their inter-

ests are aligned. The Court will next turn to defendants' argument that plaintiffs are subject to unique defenses.

### c. *Unique Defenses*

The defendants argue that class certification should be denied because claims of the named plaintiffs are subject to unique defenses—the statute of limitations and the ability of some plaintiffs to pass through any price increase of corrugated products to customers. With respect to the statute of limitations defense, they contend that Garrett Paper's president suspected that Stone was "fixing prices" throughout the class period, and voiced this concern to Stone's sales representative, and that, as a consequence, defendants have a statute of limitations defense as to Garrett Paper. Further, defendants argue that Local Baking and Oak Valley, because they are "small entities with comparatively limited purchases," might be able to avoid the statute of limitations defense which could be applicable to large, multi-national corporations. They also make statute of limitations arguments against General Refractories, stating it stopped making purchases eight months into the proposed class period,[12] and Halper, namely, that it was sensitive to, and "well aware" of the prices paid.

In some circumstances, a plaintiff who is subject to unique defenses might not be deemed an appropriate class representative. *See Zenith Labs., Inc. v. Carter–Wallace, Inc.,* 530 F.2d 508, 512 (3d Cir.1976) (sole named plaintiff subject to unique defenses including *res judicata*). "Where it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass, then the named plaintiff is not a proper class representative." *Koos v. First Nat. Bank of Peoria,* 496 F.2d 1162, 1164 (7th Cir.1974). However, when that unique defense is the statute of limitations, "whether one of the named plaintiff's claims is time-barred is a disputed issue inappropriate for adjudication

---

**11.** At oral argument, the issue of whether some contracts had, as a term, the price of the products tied to something which could not have been affected by the alleged conspiracy was discussed in connection with the predominance prong of

Rule 23(b)(3). The Court will address this argument, *infra,* in § IV.B.1.d.

**12.** Timing of purchases was addressed *supra,* in § IV.A.4.b.

at the class certification stage. While the statute of limitations defense may ultimately affect an individual's right to recover, it does not affect the presentation of the liability issues for the plaintiffs' class." *Cullen v. Whitman Med. Corp.*, 188 F.R.D. 226, 230 (E.D.Pa.1999) (citing *Gruber v. Price Waterhouse*, 117 F.R.D. 75, 80 (E.D.Pa.1987); *Rishcoff v. Commodity Fluctuations Sys. Inc.*, 111 F.R.D. 381, 382 (E.D.Pa.1986)).

The Court concludes that the unique statute of limitations defenses identified by defendants does not affect the presentation of the liability issues for plaintiff classes. *See Cullen*, 188 F.R.D. at 230–31. There is no reason to believe that any of the named plaintiffs will be "distracted by a relatively unique personal defense." *Wolgin v. Magic Marker Corp.*, 82 F.R.D. 168, 173 (E.D.Pa. 1979) (citing *Koos*, 496 F.2d at 1165).

■ Defendants also argue that Halper is an inadequate class representative because of its ability to pass through any increased costs of corrugated products to the ultimate purchasers. The ability to pass on costs is no bar to class certification. In fact, "[s]atisfaction of the impact requirement can be met by evidence that the alleged conspiracy resulted in overcharges that were 'passed-on,' at least in part, to all claimants." *In re Sugar Indus.*, 73 F.R.D. at 346 (citing *Perkins v. Standard Oil Co. of Cal.*, 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969); *In re Ampicillin Antitrust Litig.*, 55 F.R.D. 269 (D.D.C.1972); *Philadelphia Elec. Co. v. Anaconda American Brass Co.*, 43 F.R.D. 452 (E.D.Pa.1968)). In a price fixing action, each member of the class does not need to prove "that he absorbed at least some portion of the alleged overcharges as an essential liability element before reaching the damage question." *In re Sugar Indus.*, 73 F.R.D. at 346 (citing *In re Western Liquid Asphalt Cases*, 487 F.2d 191, 200–01 (9th Cir.1973) (holding in passing-on cases, the proper stage for looking at the apportionment of damages is the damages stage, as "the intermediary should recover the amount of the overcharge that was not passed on ... and any lost profits resulting from increased costs.")).

A more thorough inquiry into this passing-on argument is best suited for a later stage of the litigation. On the present state of the record, the Court concludes defendants' unique defenses argument does not adversely affect the adequacy requirement of Rule 23(a)(4).

d. *Lack of Knowledge of the Litigation*

■ Defendants attack each named plaintiff's ability to serve as an adequate class representative because, *inter alia*, they do "not know the timing or purpose of the Defendants' alleged conspiracy or any Defendants' role," they have not followed the litigation closely, and do not know the details of various aspects of the case. The Court does not agree.

For example, among the named Box Plaintiffs, Local Baking's representative, Joseph Aihini, although he mischaracterized the class he seeks to represent as "persons or businesses that have purchased linerboard," evidenced sufficient knowledge of the facts of the case. He also stated that he had spoken with his attorneys "many times." Deposition of Joseph Aihini, Feb. 27, 2001 at 149–177. While Lisa Garrett, president of Garrett, did not show a detailed knowledge of the allegations in this case, her deposition did reflect that she fully understands the role of a class representative and has been involved with counsel. Deposition of Lisa Garrett, Feb. 13, 2001. In his deposition, Richard Rogers, General Manager at Oak Valley, testified that he did not know the procedural posture of the case, the role of each individual defendant, or "when the conspiracy was adopted." Deposition of Richard Rogers, Feb. 15, 2001. However, he understood "that there was a collusion among a number of companies to set the price of linerboard during a period of time which affected us and others." *Id.* at 6. The named Box Plaintiffs are all adequate class representatives, and will be allowed to serve as such.

As for the named Sheet Plaintiffs, defendants argue that General Refractories' general counsel, Barry Katz, does not have sufficient knowledge of the facts of the case. In his deposition, Mr. Katz stated that he did not know in what manner General Refractories used corrugated sheets or boxes. Depo-

sition of Barry L. Katz, Feb. 8, 2001, at 91. He also did not have any knowledge of the price trends of corrugated products during the class period. *Id.* at 130–31. However, he stated that he had a "general understanding" that the defendants "conspired to set prices for sheets." *Id.* at 160. His knowledge was "limited to what's alleged in the Complaint and the Amended Complaint." *Id.* at 173.

"Antitrust plaintiffs must show an interest in the litigation but need not have extensive personal knowledge of the facts tending to prove a conspiracy in order to be adequate representatives." 4 *Newberg on Class Actions* § 18.20. *See also In re Glassine & Greaseproof Paper,* 88 F.R.D. at 305 n. 3 ("[C]lass representatives in complex cases of this nature are not usually required to have first-hand knowledge of the facts needed to establish their claims."); *In re Cephalon Sec. Litig.,* 1998 WL 470160, at *3 ("[T]he class representative's complete understanding of the legal basis for the claims is not required by Rule 23.") (citing *Barnes v. American Tobacco Co.,* 176 F.R.D. 479, 486–86 (1997)). "[I]t is unrealistic to require a class action representative to have an in-depth grasp of the legal theories of recovery behind his or her claim. It is more important that the representative actively seeks vindication of his or her rights and engages competent counsel to prosecute the claims." *In re Cephalon,* 1998 WL 470160, at *3 (citing *Barnes,* 176 F.R.D. at 486.). *See also In re Resource America,* 202 F.R.D. at 186–87.

For example, this Court has ruled that what is required with respect to adequacy of representation is that a named plaintiff has "a basic understanding of the allegations made in the case, and what law is alleged to have been violated, and that he would be willing to contest an action by his attorneys with which he did not agree." *In re Resource America,* 202 F.R.D. at 186–87. In *Lewis v. Curtis,* 671 F.2d 779 (3d Cir.1982), *recognized as superceded on other grounds, Garber v. Lego,* 11 F.3d 1197, 1206–07 (3d Cir.1993), the Third Circuit held that a plaintiff who "displayed a complete ignorance of facts concerning the transaction that he was challenging" was able to represent the inter-

ests of other shareholders. *Lewis,* 671 F.2d at 789. "The adequacy-of-representation test is not concerned whether plaintiff personally derived the information pleaded in the complaint or whether he will personally be able to assist his counsel." *Id.* Upon reviewing the depositions of the various plaintiffs' representatives, the Court concludes that all named Sheet Plaintiffs are more involved and knowledgeable than the plaintiff in *Lewis.*

### e. *Lack of Financial Resources*

■ Finally, defendants argue that Halper does not have the financial wherewithal to prosecute the case. They state that under *Apanewicz v. General Motors Corp.,* 80 F.R.D. 672 (E.D.Pa.1978) and *Rolex Employees Retirement Trust v. Mentor Graphics Corp.,* 136 F.R.D. 658 (D.Or.1991) the law requires a named plaintiff to have the financial resources to pay for the litigation costs. In *Apanewicz,* the Court declined to certify a class because, *inter alia,* the named plaintiff did not have the financial resources to prosecute the case. *See* 80 F.R.D. at 679–80. The portion of *Rolex Employees* which dealt with a potential named plaintiff's financial resources was primarily concerned with "attorneys hav[ing] free reign over the prosecution of the action." *Rolex,* 136 F.R.D. at 666.

Plaintiffs argue that *Apanewicz* is outdated because it was decided before Rule 1.8(e) of the Pennsylvania Rules of Professional Conduct were passed. That Rule provides:

> A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that: (1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter.

Plaintiffs' position on this issue is supported by *Kline v. First Western Gov't Sec., Inc.,* 1996 WL 153641, *11 (E.D.Pa. Jan. 24, 1996). Further, the Court notes that the named plaintiffs in a class action need not assume responsibility for all expenses since it is the entire class that may benefit from successful litigation. *See Kline,* 1996 WL 153641, *11 (citing *Rand v. Monsanto Co.,* 926 F.2d 596, 600 (7th Cir.1991)).

There is no allegation that General Refractories does not have the financial resources to prosecute this case, and assuming *arguendo* that is a requirement, having one named plaintiff with those resources is sufficient. Moreover, the Court is satisfied that the attorneys do not have free reign over the prosecution of the action.

## B. The Two Elements of 23(b)(3)

Once the four elements of Rule 23(a) have been satisfied, plaintiffs must satisfy the two prongs of Rule 23(b)(3). First, plaintiffs must show that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). Secondly, plaintiffs must show that "a class action is superior to other available methods for the fair an efficient adjudication of the controversy." *Id.*

At the outset, the Court notes that there is an overlap between the predominance requirement of Rule 23(b)(3) and the prerequisite of Rule 23(a)(2) that common questions exist. "The courts have repeatedly focused on the liability issues, in contrast to damage questions, and, if they found issues were common to the class, have held that Rule 23(b)(3) was satisfied." 4 *Newberg on Class Actions*, § 18–26.

▮ To prevail on a price-fixing conspiracy claim, plaintiffs must prove three elements: (1) that defendants violated antitrust laws; (2) the fact of damage, also called impact, of the unlawful activity; and (3) the amount of damages sustained because of the unlawful activity. *See Lumco Indus., Inc. v. Jeld–Wen, Inc.*, 171 F.R.D. 168, 172 (E.D.Pa. 1997); *In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374, 381 (S.D.N.Y.1996). On a motion for class certification, it is plaintiffs' burden to establish that common or generalized proof will predominate at trial with respect to these essential elements of their antitrust claim. *See In re Industrial Diamonds*, 167 F.R.D. at 381; *In re Plastic Cutlery Antitrust Litig.*, 1998 WL 135703, *5 (E.D.Pa. Mar. 20, 1998) ("In a price-fixing antitrust class action, plaintiffs must establish that both the defendants' violations of law and the impact of those violations on the

class members involve predominantly common issues. Plaintiffs must therefore make a threshold showing that the element of impact will predominantly involve generalized issues of proof, rather than questions which are particular to each member of the plaintiff class." (internal citations omitted)).

### 1. *Predominance*

"Predominance measures whether the class is sufficiently cohesive to warrant certification." *Newton*, 259 F.3d at 186–87 (citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 2249, 138 L.Ed.2d 689 (1997)). Defendants make two main arguments that class certification is not warranted because individualized issues predominate. First, they argue that the plaintiffs advance a unique and complicated conspiracy theory that distinguishes this case from the traditional antitrust cases. Secondly, they contend that plaintiffs cannot prove class wide impact.

### a. *Plaintiffs' Conspiracy Theory Does Not Preclude Predominance*

▮ Defendants argue that plaintiffs' conspiracy theory is different from the "traditional" price-fixing conspiracy in four respects: first, plaintiffs did not buy linerboard—the product which is the target of the alleged conspiracy; second, plaintiffs do not allege that defendants actually fixed the price of linerboard, and instead they restricted supply; third plaintiffs' theory relies on market forces of supply and demand; and, fourth, plaintiffs contend that the impact on the prices of sheets and boxes was felt for several years after the alleged misconduct. In short, defendants contend that "it is simply too difficult to prove common impact on a class-wide basis in an indirect, curtailment-of-supply case."

At oral argument, defendants explained that, in their view, a "traditional" price-fixing conspiracy involves a proximity of the buyers and sellers, that is, the buyers and sellers are all in the same market. Hr'g Tr. at 79. They contrasted that situation to this case which they characterize as having one market for linerboard, a second for corrugated sheets, and a third for corrugated containers.

Hr'g Tr. at 80. In defendants' view, plaintiffs' allegations that there is a correlation between the price of linerboard and the prices of the corrugated products are not sufficient to warrant class certification. Hr'g Tr. at 81. Further, defendants argue that because plaintiffs were indirect purchasers of linerboard, individual issues will predominate.

Plaintiffs respond that this case is not atypical. To support their position they presented evidence that the prices of corrugated sheets and boxes is directly related to the price of linerboard. First, they produced several charts which showed that the average prices for corrugated products closely paralleled the prices of linerboard, produced not only by one of plaintiffs' experts, but also by some of the defendant companies. They also produced a document entitled "Comments on Linerboard Pricing, Exports, Et. Al. In Response to Question 2" which states "Box prices are driven by movements in linerboard prices, typically lagging linerboard price changes by 90–180 days." Ex. C, attached to Exhibits in Support of Plaintiffs' Reply Memorandum in Support of Class Certification (Doc. 90). Further, the *Pulp & Paper 1999 North American Factbook* states "Linerboard prices tend to be the major factor driving corrugated box prices...." Fischer Aff. Ex. D.

The Court concludes that plaintiffs have produced evidence to support their contention that the prices of corrugated sheets and boxes are directly related to the price of linerboard. Since the prices of corrugated sheets and boxes are correlated to the price of linerboard, plaintiffs argue that there is little significance to the argument that they did not directly purchase linerboard. The Court agrees.

When considering class certification issues, a court must consider two lines of authority. The first, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), teaches that the Court must not inquire "into the merits of a suit in order to determine whether it may be maintained as a class action." *Id.* at 177, 94 S.Ct. at 2152. The second instructs that "many of the questions entering into determination of class action questions is intimately involved with the merits of the claim." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n. 12, 98 S.Ct. 2454, 57 L.Ed.2d 351. *See also, In re Resource America*, 202 F.R.D. at 182–83. Recently, the Third Circuit addressed these lines of authority, and held that in "reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action." *Newton*, 259 F.3d at 167–69. *See also Manual for Complex Litigation (Third)* (1995) § 30.1 ("The decision on whether or not to certify a class, therefore, can be as important as decisions on the merits of the action and should be made only after consideration of all relevant evidence and arguments presented by the parties."). This is such a case. The Court addresses defendant's arguments in turn.

First, the Court notes that a case which alleged reduction in output can be considered a price-fixing case. In *General Leaseways, Inc. v. National Truck Leasing Association*, 744 F.2d 588 (7th Cir.1984), Judge Posner explained:

> A firm that is free from effective competition will reduce its output below the competitive level (whether directly or, as we shall see in a moment, indirectly by raising price). Consumers will pay more when supply is scarcer, yet it will cost the firm less to produce a smaller supply—so the firm's profits will be greater at the reduced output.
>
> \*　\*　\*　\*　\*　\*
>
> An agreement on output also equates to a price-fixing agreement. If firms raise price, the market's demand for their product will fall, so the amount supplied will fall too—in other words, output will be restricted. If instead the firms restrict output directly, price will as mentioned rise in order to limit demand to the reduced supply. Thus, with exceptions not relevant here, raising price, reducing output, and dividing markets have the same anticompetitive effects.

*Id.* at 594–95. *See also Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 226

(7th Cir.1978) ("[A]n agreement to restrict the production of uranium unquestionably is a price fixing arrangement.... In fact, all serious attempts to establish a supracompetitive price must necessarily include an agreement to restrict output."); *United States v. Andreas,* 216 F.3d 645, 667 (7th Cir.2000) ("Functionally, an agreement to restrict output works in most cases to raises [sic] prices above a competitive level and for this reason, output restrictions have long been treated as *per se* violations [of § 1 of the Sherman Act]. A prototypical output restriction raises prices by reducing supply below demand." (internal citations omitted)). Therefore, the fact that the plaintiffs' conspiracy theory rests on the market effects of a reduction in output does not make it unsuitable for class certification. Rather, plaintiffs' theory puts the case into an established category of antitrust cases.

Both parties rely heavily on *In re Sugar Industry Antitrust Litigation* on the question of whether plaintiffs, as indirect purchasers of linerboard, may maintain this suit. In that case, involving, *inter alia,* a sugar price-fixing conspiracy, the district court certified three of four classes of sugar purchasers: (1) persons and entities who purchased refined sugar for use in other products; (2) retail grocers who purchased refined sugar for resale; and (3) institutional users of sugar, meaning entities which purchased refined sugar for use in the sale of food and beverages, or in dispensing individual sugar packets. *See* 73 F.R.D. at 328. The district court did not certify a fourth proposed class—a class of wholesalers who "have purchased from defendants directly refined sugar, or food products or beverages containing refined sugar" for distribution. *Id.* However, the Third Circuit reversed, and allowed the fourth proposed class to present its claims. *See In re Sugar Indus. Antitrust Litig.,* 579 F.2d 13, 19 (3d Cir.1978).

The Third Circuit, in allowing the claims of the wholesaler class to proceed, held that under the then-recent decision in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), if plaintiffs purchased items which incorporated the price-fixed sugar, such as candy, directly from the producer, their suit was not barred by the Clayton Act. *In re Sugar Indus.,* 579 F.2d at 17. The court noted that

> the product which plaintiff purchased competes not with sugar, but with other candy, and more than one ingredient determines the price. To this extent, there will be some additional complications underlying the damage claims. However, this must not be allowed to obscure the fact that the *plaintiff did purchase directly from the alleged violator....* Plaintiff is a direct purchaser and, therefore, entitled to recover the full extent of the overcharge.

*Id.* at 17–18 (emphasis added).

Similarly, plaintiffs in this case purchased corrugated sheets or boxes directly from the defendants. *See* Sheets Complaint II at ¶ 5 (General Refractories), ¶ 7 (Halper); Corrugated Box Amended Complaint at ¶ 7 (Oak Valley), ¶ 8 (Garrett Paper), ¶ 9 (Local Baking). Like the candy in *In re Sugar Industries* which contained allegedly price fixed sugar, the corrugated sheets and boxes contain linerboard that was subject to an agreement on output, which is equivalent to a price-fixing agreement. *See General Leaseways,* 744 F.2d at 594–95. The plaintiffs are direct purchasers and, therefore, are entitled to recover the full amount of any overcharge.

The arguments of both parties on this point are directed at an issue not appropriately suited for resolution at the class certification stage. Plaintiffs have presented enough evidence to support their claims that a conspiracy to reduce the supply of linerboard raised the prices of corrugated products. The Court next turns to the question whether plaintiffs can prove class wide impact.

### b. *Common Proof of Impact*

Defendants argue that plaintiffs have not come forward with a viable method of proving impact, thus destroying the predominance requirement of Rule 23(b)(3). They argue at great length that the class certification motions should be denied because plaintiffs have not demonstrated the ability to establish impact or the fact of damage on a class-wide basis. They contend that impact cannot be proven because of the complexities of plaintiffs' argument, and because plaintiffs'

experts' opinions do not meet plaintiffs' burden of demonstrating that they can prove class-wide impact. Specifically, they argue that a distinction must be drawn between an econometric model used to establish class-wide impact or causation and an econometric model for proving class-wide damages, and emphasize that none of plaintiffs' experts provided the details of any such model. Further, defendants argue that during the proposed class period, the price that at least one named plaintiff paid for corrugated boxes decreased.

Many courts have held that impact can be presumed upon proof of a conspiracy. *See Lumco Indus., Inc. v. Jeld–Wen, Inc.,* 171 F.R.D. 168, 172 (E.D.Pa.1997); *In re Citric Acid Antitrust Litig.,* 1996 WL 655791, *7 (N.D.Cal. Oct. 2, 1996); *In re Sugar Indus. Antitrust Litig.,* 1976 WL 1374, *24 (N.D.Cal. May 21, 1976); 4 *Newberg on Class Actions,* § 18.28 ("As a rule, the allegation of a price-fixing conspiracy is sufficient to establish predominance of common questions."). This is such a case.

In *Bogosian,* the Third Circuit addressed the issue of impact or "fact of damage" in an antitrust class action. The plaintiff class consisted of over 100,000 service stations lessees who filed a class action against national and regional oil companies, alleging that defendants had unlawfully tied the leasing of gas station sites to the purchase of gasoline. The District Court denied plaintiffs' motion for class certification. The Third Circuit reversed and remanded, holding that a showing of impact in an antitrust case did not require that each class member show individual injury. The Third Circuit stated that "when an antitrust violation impacts upon a class of persons who do have standing, there is no reason in doctrine why proof of the impact cannot be made on a common basis so long as the common proof adequately demonstrates some damage to each individual." *Bogosian,* 561 F.2d at 454. The Third Circuit continued:

> If, in this case, a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at a higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage.... Under these circumstances, proof on a common basis would be appropriate.

*Id.* at 455. *See also In re Flat Glass,* 191 F.R.D. at 485–86 (quoting *Bogosian*); *Lumco Indus.,* 171 F.R.D. at 173 (same).

Defendants also make the argument that, under *Newton v. Merrill Lynch,* plaintiffs' experts are required to demonstrate a viable econometric model for proving impact at the class certification stage, and they do not.[13] That proposition is not supported by *Newton.*

*Newton* involved a putative securities class action in which investors charged that their broker-dealers breached their duty to execute trades on the most favorable terms rea-

---

**13.** To the extent that this discussion involves a battle of experts, it not appropriate for the Court to determine which expert is more credible at this time. In *In re Visa Check/Mastermoney Antitrust Litigation,* 192 F.R.D. 68 (E.D.N.Y.2000), the court, in ruling upon a motion to strike an expert report, expounded upon the role of a *Daubert*-type inquiry at the class certification stage. *See id.* at 76. It held that an expert opinion "is admissible for the narrow purpose for which it is offered: to support the plaintiffs' class certification motion." *Id.* at 77. To preclude such evidence at the class certification stage, it must be shown that the "opinion is the kind of 'junk science' that a *Daubert* inquiry at this preliminary stage ought to screen." *Id.* (citing *Iacobelli Constr., Inc. v. County of Monroe,* 32 F.3d 19, 25 (2d Cir.1994)).

No limiting motions were filed in the present case although the parties have raised questions about the opposing experts. On the present state of the record, the Court, where appropriate, will use plaintiffs' experts' reports to support the allegations contained in plaintiffs' class certification motions.

sonably available. 259 F.3d at 161–63. Specifically, plaintiffs charged that their brokers could have received a better price for securities had they used a computer system other than the central National Best Bid and Offer system ("NBBO"). The evidence disclosed that on some occasions, the NBBO price was better than on other computer systems, at times, the prices were the same, and at other times, the NBBO price was worse than on other systems. *Id.* at 177–80. Under those circumstances, the Third Circuit concluded that not every class member was injured by the failure of the brokers to find the best possible price. *Id.* at 187–88.

In analyzing proof of impact the court held:

> Whether a class member suffered economic loss from a given securities transaction would require proof of the circumstances surrounding each trade, the available alternative prices, and the state of mind of each investor at the time the trade was requested. This Herculean task, involving hundreds of millions of transactions, counsels against finding predominance.

*Id.* at 187–88.

Continuing, the court stated:

> In an effort to gloss over this requirement, plaintiffs suggest their expert could calculate the amount of damages each class member sustained thereby removing proof of injury as an obstacle to certification. In a sworn declaration, plaintiffs' expert provided no model formula, but instead projected that he could devise a formula that would measure damages among the class and serve as a plan for allocation. We are not convinced. But even if plaintiffs could present a viable formula for calculating damages (which they have not), defendants could still require individualized proof of economic loss.

*Id.* (footnote omitted).

Plaintiffs in this case have advanced econometric models to be used to establish impact.[14] Plaintiffs' expert, Dr. Beyer, has presented two possible means of assessing impact on a class wide basis—multiple regression analysis, and the benchmark or yardstick approach, Beyer Aff. ¶¶ 38–44, which are methods of showing "antitrust impact by generalized proof." *See In re Plastic Cutlery,* 1998 WL 135703 at *7; *In re Flat Glass,* 191 F.R.D. at 485–86 (identifying multiple regression analysis as method of proving impact).

> "Multiple regression analysis is a statistical tool for understanding the relationship between two or more variables.... [It] is sometimes well suited to the analysis of data about competing theories in which there are several possible explanations for the relationship among a number of explanatory variables.... [It] may also be useful (1) in determining whether a particular effect is present; (2) in measuring the magnitude of a particular effect; and (3) in forecasting what a particular effect would be, but for an intervening event."

Daniel L. Rubinfeld, *Reference Guide on Multiple Regression,* in *Reference Manual on Scientific Evidence* 179, 181 (2d ed.2000). Multiple regression analysis "can be used to isolate the effects of various influences on corrugated container prices, thereby allowing a determination of the impact of any one of the variables, including, in this case, the impact of the conspiracy." Beyer Aff. at ¶ 43. As the court stated in *In re Plastic Cutlery:* "[t]he court of appeals has noted that multiple regression analysis is reliable when based upon complete and accurate data." *In re Plastic Cutlery,* 1998 WL 135703, at *7 (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.,* 998 F.2d 1224, 1238 (3d Cir.1993); *Lumco Indus.,* 171 F.R.D. at 174). The yardstick or benchmark model involves a comparison of the characteristics of the linerboard and corrugated products industry with the characteristics of a comparable, or "yardstick" industry that is not affected by the price-fixing conspiracy. *See In re Plastic Cutlery* at *7. Dr. Beyer stated that he would estimate linerboard prices that would have existed absent the conspiracy based on an analysis of linerboard pricing

14. These models can also be used to show a method for calculating the damages, the amount

of the overcharge.

behavior during a more competitive period of time, either before or after the conspiracy. Beyer Aff. ¶ 41.

*Newton* does not require plaintiffs to have selected a particular econometric model for demonstrating impact (or proving damages) at the class certification stage, and this Court will not so rule. In *In re Corrugated Container Antitrust Litig.*, 80 F.R.D. 244 (S.D.Tex.1978), the identical situation was presented to that court, namely, plaintiffs' expert identified two generally accepted methodologies which he planned on using to determine impact and damages. The court, relying heavily on *Bogosian*, accepted that contention and certified the class. *Id.* at 251–52. Without explicitly so stating, the court did not require the expert to pick one particular method at the class certification stage, since that stage is early in the litigation. *Id.*

Further, defendants characterize *Newton* as requiring dismissal of a class action if even a small percentage of class members are not impacted by the conspiracy. They argue that the district court denied certification based on an analysis of twelve trades, out of hundreds of millions, in which only one resulted in actual economic injury to plaintiffs. 259 F.3d at 177–80. That is not why class certification was denied. *Id.* In affirming the denial of class certification on predominance issues, in addition to the proof of impact analysis detailed above, the Third Circuit identified a list of other terms a broker-dealer must take into account in addition to price, including "order size, trading characteristics of the security, speed of execution, clearing costs, and the cost and difficulty of executing an order in a particular market." *Id.* at 187–88 (citing *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 270 & n. 2 (3d Cir.1998) (en banc)). That court found the inquiry overwhelmingly individualized, and the predominance required not satisfied because these factors "would appear to vary from class member to . class member and, for each class member, from trade to trade." *Id.*

On this issue, *Newton* is fundamentally different from the case at bar. In *Newton*, individual issues predominated because of the particularized nature of the inquiry required by the particular facts of the case. Not everyone was injured. In this case, because of the alleged conspiracy, all purchasers [15] of corrugated sheets and boxes were injured to the extent the increased price of linerboard was reflected in the price paid by plaintiffs. Additionally, experts have been able to create viable formulas for calculating damages caused by price-fixing. *See, e.g., In re Plastic Cutlery*, 1998 WL 135703 at *7; *In re Flat Glass*, 191 F.R.D. at 486–87.

Finally, defendants make the argument that, since the price Garrett Paper paid for pizza boxes decreased during the first five weeks of the class period, proof of impact is not common to the class. The Court disagrees.

The proof which plaintiffs must "adduce to establish a conspiracy to fix prices, and that defendants['] base price was higher than it would have been absent the conspiracy, would be common to all class members." *In re Flat Glass*, 191 F.R.D. at 486. As the court explained in *In re Industrial Diamonds Antitrust Litigation*,

> [i]t a number of price-fixing cases concerning industries where discounts and individually negotiated prices are common, courts have certified classes where the plaintiffs have alleged that the defendants conspired to set an artificially inflated base price from which negotiations for discounts began. The theory that underlies these decisions is, of course, that the negotiated transaction prices would have been lower if the starting point for negotiations had been list prices set in a competitive market. Hence, if a plaintiff proves that the alleged conspiracy resulted in artificially inflated list prices, a jury could reasonably conclude that each purchaser who negotiated an individual price suffered some injury.

*In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374, 383 (S.D.N.Y.1996) (citations

---

**15.** The exception being those purchasers whose contracts were tied to a factor independent of the price of linerboard. Those purchasers will be excluded from the classes. *See, infra,* § IV.B.1.d.

omitted). *See also United States v. Container Corp.*, 393 U.S. 333, 337, 89 S.Ct. 510, 513, 21 L.Ed.2d 526 (1969) (holding that stabilizing prices, even at a "downward level" is a violation of the Sherman Act); *In re Plastic Cutlery*, 1998 WL 135703 at *7 (quoting *In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. at 383).

For purposes of class certification, the Court concludes that plaintiffs have presented a viable method for proving class-wide impact. At this point of the litigation, it would be improper to make a determination as to the likely success of using one of the identified methods. *See In re Flat Glass*, 191 F.R.D. at 487. Rather, the court need only find that plaintiffs have identified a valid method for determining impact, which they have.[16]

Plaintiffs have shown that they plan to prove common impact by introducing generalized evidence which will not vary among individual class members. For example, plaintiffs contend that even though prices may have varied among regions, the alleged conspiracy caused these prices to rise throughout the country. Although the prices for corrugated sheets and boxes may have increased due to demand, because defendants allegedly conspired to reduce production of linerboard, the price was higher than it would have been under competitive conditions. Such allegations, supported by the evidence presented, are of the kind contemplated by the Third Circuit in *Bogosian* and *Newton*. *See also, Lumco Indus.*, 171 F.R.D. at 173.

The Court recognizes that defendants dispute plaintiffs' allegations. However, at the class certification stage, "the Court need not concern itself with whether Plaintiffs can prove their allegations regarding common impact; the Court need only assure itself that Plaintiffs' attempt to prove their allegations will predominantly involve common issues of fact and law." *Lumco Indus.*, 171 F.R.D. at 174–74. "Plaintiffs need only make a threshold showing that the element of impact will predominantly involve generalized

issues of proof, rather than questions which are particular to each member of the plaintiff class." *Id.* (citing *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524 (M.D.Fla.1996)). Therefore, the Court concludes that plaintiffs' allegations regarding impact, like their allegations regarding conspiracy, will focus the inquiry on defendants' actions, not on individual questions relating to particular plaintiff class members.

### c. Damages

With respect to the amount of damages, the Third Circuit has stated that "[b]ecause separate proceedings can, if necessary, be held on individualized issues such as damages or reliance, such individual questions do not ordinarily preclude the use of the class action device." *In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d at 817 (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.1985)). *See In re Flat Glass*, 191 F.R.D. at 487 (citing same). Its has also been recognized that "some relaxation of the plaintiff's burden of proving damages is tolerated once an antitrust violation and resulting damages have been established." *In re Flat Glass*, 191 F.R.D. at 487 (quoting 4 *Newberg on Class Actions* § 18.27, at 4S–16 (3d ed. Supp.1998)).

The Court notes that the econometric methods plaintiffs have proposed for proving impact can also be used to calculate damages. *See Lumco Indus.*, 171 F.R.D. at 174 (stating that the yardstick model is a "logical and feasible" method of determining damages). Even though individual issues may arise in calculating damages, this fact does not defeat class certification. *See In re Flat Glass*, 191 F.R.D. at 487 (citing *Bogosian*, 561 F.2d at 456).

### d. Scope of Classes

■ At oral argument, defendants pointed out one group of plaintiffs which could not have suffered injury—those purchasers of corrugated sheets or boxes whose contracts were tied to particular factors other than the price of linerboard. Similarly, they raised the issue of spot purchasers, putative class

---

16. In light of the conflicting expert evidence presented, and the detailed arguments of the parties, the Court is of the belief that such arguments go to the weight of the testimony and must be resolved by the finder of fact.

members who purchased boxes and sheets as the need arose. Defendants argued that by including these people in the classes, individual issues of damages, as in *Newton,* would predominate.

The *Manual for Complex Litigation (Third)* provides the Court with guidance on the issue of class definition. It instructs that it is "necessary to arrive at a definition that is precise, objective, and presently ascertainable." *Manual for Complex Litigation (Third)* § 30.14. "Definitions, particularly under (b)(3), should avoid criteria that are subjective (e.g., a plaintiff's state of mind) or that depend on the merits (e.g., persons who were discriminated against).... Similarly, objective terms should be used in defining persons to be excluded from the class." *Id.*

Clearly, purchasers of corrugated products under contracts which did not key prices to the price of linerboard must be excluded from the class. On this issue, based on the presentations of the parties at oral argument, identifying those purchasers will not, as in *Newton,* require any "Herculean task." 259 F.3d at 187–88. Thus, the Court will exclude from the class those purchasers of corrugated sheets and corrugated boxes whose contracts precluded the alleged conspiracy from affecting them because the prices paid were not tied to the price of linerboard.

■ The Court will not exclude spot purchasers of corrugated sheets and corrugated boxes from the definition of the class. If a conspiracy existed to restrict the supply of linerboard, thereby artificially raising the price of corrugated products, it necessarily affected anyone who made purchases during the class period which were linked to the price of linerboard. Therefore, even though there may have been price negotiations involved in these spot purchases, "if plaintiffs can establish that the base price from which these negotiations occurred was inflated, this would establish at least the fact of damage, even if the extent of the damage by each plaintiff varied." *In re Flat Glass,* 191 F.R.D. at 486 (citing *Bogosian,* 561 F.2d at 455). Likewise, if plaintiffs can establish that a list price was higher, they can demonstrate proof of impact. Therefore, spot pur-

chasers will be certified as part of the classes.

### e. *Class Period*

Plaintiffs ask the Court to certify both classes starting October 1, 1993 and continuing through November 30, 1995. They argue that this period represented the time in which the price of corrugated boxes and containers was effected by the price-fixing conspiracy. Defendants argue that this proposed period is not supported by the evidence.

#### i. *Beginning Date*

■ Plaintiffs base their proposed class period on the length of time that the inventories of linerboard were affected by the alleged conspiracy. The start of the proposed class period is several months after the first production reduction took place. This date is based, in part, on evidence which stated "Box prices are driven by movements in linerboard prices, typically lagging linerboard price changes by 90–180 days." Ex. C., attached to Exhibits in Support of Plaintiffs' Reply Memorandum in Support of Class Certification (Doc. 90). Plaintiffs contend that since defendants took mill downtime in July 1993, October 1, 1993, is an appropriate beginning date as it incorporates this lag time. Moreover, defendants to not seriously challenge this date as the beginning of a potential class period. Therefore, the Court will accept October 1, 1993 as the beginning date for the proposed class.

#### ii. *Ending Date*

■ As with all other aspects of plaintiffs' claims at this stage of the litigation, the length of the class period must have some factual support. Plaintiffs have produced evidence on this point. For example, in a September 1993 presentation, Roger Stone, then president of Stone, stated that "once the inventory overhang is gone, it can't be rebuilt for a minimum of a two-and-a-half year period." Ex. Z to Plaintiffs' Reply Memorandum in Support of Class Certification (Doc. 90). Moreover, in 1994, Mr. Stone stated "We firmly believed that this strategic decision would jump-start our company's—and our

industry's—recovery. We also strongly believed that, due to our industry's limited capacity growth, once the overhang was gone, out industry would be hard pressed to but it back for at least several years." Ex. N to Plaintiffs' Reply Memorandum in Support of Class Certification (Doc. 90).

In addition, the 1996 edition of the *Pulp & Paper North American Factbook* described the linerboard price increases as peaking in mid-year 1995. It stated that "[t]he U.S. linerboard market peaked in the spring of 1995 after a dramatic 18–month recovery. Linerboard prices in the eastern U.S. rose in six consecutive price increases from a low of around $270 to $290/ton in third-quarter 1993 to $530/ton by April 1995—exceeding the previous cyclical peak of $410/ton reached in 1988 in both current and inflation-adjusted constant dollar terms." Ex. P to Plaintiffs' Reply Memorandum in Support of Class Certification (Doc. 90).

At oral argument, plaintiffs produced a chart entitled Containerboard Inventory—End of Month, in support their claim. *See* Tab 3 of Defendants' Class Certification Oral Argument Exhibits (Document No. 104, filed August 16, 2001). On that chart, they noted the reported decrease in the weeks of supply [17] of containerboard during the class period. Defendants argued that the relevant inquiry should be the inventory of linerboard.

Defendants also pointed to a seeming discrepancy in Dr. Beyer's testimony. He testified that imports of linerboard, which between 1993 and 1995 were over 300,000 tons per year, would have an effect on the price of linerboard that is "probably negligible". *See* Tab 2 of Defendants' Class Certification Oral Argument Exhibits, whereas the "up to 500,-000" tons of linerboard not produced had a two and a half year impact on prices. Defendants argue that this contradiction in logic nullifies plaintiffs' argument. In response, plaintiffs contend that imports do not affect inventory, whereas linerboard mill downtime does. Specifically, plaintiffs aver that when trade inventories are at a certain level, customers perceive this level, through trade publications, as evidence of a dwindling sup-

ply, thereby making them amenable to price increases or continued purchases at inflated prices. In contrast, plaintiffs say that the level of imports does not have this effect on the market. Hr'g Tr. at 21–23. The Court concludes this is an issue which goes to the merits of the case and is best resolved at a later stage of the proceedings; it does not preclude class certification.

Plaintiffs have produced sufficient evidence to support the proposed class period ending on November 30, 1995. In so ruling, the Court has followed the Third Circuit's instructions in *Newton,* to make a "preliminary inquiry into the merits." *Newton,* 259 F.3d at 167–69. Defendants' arguments are not appropriate for resolution at this stage in the litigation.

### f. *Fraudulent Concealment*

 To toll the four-year statute of limitations of the Sherman Act, and to be entitled to establish claims which extend beyond that period, plaintiffs must demonstrate that defendants fraudulently concealed their unlawful activities and that each plaintiff did not discover these facts despite the exercise of due diligence. See *In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1178–79 (3d Cir.1993). It generally has been recognized that the question of concealment is a common question, while the questions of discovery of the cause of action by a plaintiff and plaintiff's due diligence present individualized questions. *See In re Flat Glass,* 191 F.R.D. at 487.

Defendants argue that common issues of proof do not predominate with respect to the tolling of the statute of limitations for fraudulent concealment and is therefore not appropriate for class treatment. In reply, plaintiffs argue that principal focus will be on defendants affirmative acts of concealment, and therefore the proof of fraudulent concealment would be common to each member of the classes.

The great majority of cases on this point counsel the Court to conclude that common issues predominate over individual ones with respect to fraudulent concealment. *See In re*

---

**17.** The chart notes that "Weeks of supply is obtained by dividing inventories by the weekly consumption in box plants for the current month, excluding weekends and holidays."

*Flat Glass,* 191 F.R.D. at 488; *In re Glassine and Greaseproof Paper,* 88 F.R.D. at 307; *Hedges Enters.,* 81 F.R.D. at 476 ("that the issues of conspiracy and fact of damage are common to the class and that, while the issues of damages and fraudulent concealment contain both common and individual questions, the common issues predominate with respect to those issues"); *In re Corrugated Container,* 80 F.R.D. at 248 ("criteria are clearly met in spite of any differences regarding the statute of limitations"); *In re Sugar Indus.,* 73 F.R.D. at 348 ("individual aspects of the question of fraudulent concealment do not predominate over the other common issues"); *In re NASDAQ Market–Makers,* 169 F.R.D. at 520 ("Insofar as the individual Plaintiffs are all members of the investing public, their knowledge and diligence with respect to the information Defendants allegedly concealed from the public can be litigated collectively, without significant reference to individual differences in knowledge or diligence"); *Service Spring, Inc. v. Cambria Spring Co.,* 1984 WL 2925 (N.D.Ill. Jan. 6, 1984).

Defendants cite three cases in which courts have denied class certification based, among other reasons, on findings that fraudulent concealment presents individual issues significant enough to preclude a conclusion that common questions predominate. *See Chevalier v. Baird Sav. Ass'n,* 72 F.R.D. 140 (E.D.Pa.1976); *In re Anthracite Coal Antitrust Litig.,* 78 F.R.D. 709 (M.D.Pa.1978); *Krehl v. Baskin–Robbins Ice Cream Co.,* 78 F.R.D. 108 (C.D.Cal.1978). This Court disagrees with those cases and concludes that the fact of concealment is the predominating question, even though individual questions are also raised, because the inquiry necessarily focuses on defendants' conduct rather than that of plaintiffs. *See In re Flat Glass,* 191 F.R.D. at 488.

In conclusion, the Court determines that the issues of conspiracy and impact are common to the classes and that, while the issues of damages and fraudulent concealment include both common and individual questions, the common issues predominate with respect to those issues. Therefore, those questions of law and fact which are common to the

members of the class predominate over those affecting only individual members, and accordingly, the predominance requirement of Rule 23(b)(3) is satisfied.

### 2. *Superiority*

■ Under Rule 23(b)(3), the Court must next "balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." *Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 632 (3d Cir.1996) (citations omitted), *aff'd sub nom. Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). First, the Court concludes that a class action is the fairest way to adjudicate the questions raised in this case, as the cost of maintaining individual actions in this sort of antitrust case would be prohibitive. *See, e.g., Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.1985) ("Class actions are a particularly appropriate and desirable means to resolve claims based on the securities laws, 'since the effectiveness of the securities laws may depend in large measure on the application of the class action device.'" (quoting *Kahan v. Rosenstiel,* 424 F.2d 161, 169 (3d Cir.1970))); *Rosen v. Fidelity Fixed Income Trust,* 169 F.R.D. 295, 301 (E.D.Pa.1995) ("class certification remains a desirable method of seeking redress under the securities laws, particularly where, as here, 'a large number of individuals [allegedly] have been injured, although no one person may have been damaged to a degree which would have induced him to institute litigation solely on his own behalf.'" (quoting *In re Regal Communications Corp. Sec. Litig.,* 1995 WL 550454, *7 (E.D.Pa. Sept. 14, 1995)) (alteration in original)).

Secondly, the class action will not be inefficient or unmanageable. Each class member's claims center on common questions of law and fact—namely whether or not the defendants committed the acts alleged—which require the same sort of proof. *See Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 350, 103 S.Ct. 2392, 2395, 76 L.Ed.2d 628 (1983) ("The principal purposes of the class action procedure [are] promotion of efficiency and economy of litigation.").

Therefore, the Court determines that plaintiffs have satisfied the conditions of Rule

23(b)(3) as common questions of law or fact predominate over individual questions, and a class action is superior to individual suits.

### C. Definition of the Classes

"Care should be taken to define the class in objective terms capable of membership ascertainment when appropriate, without regard to the merits of the claim or the seeking of particular relief. Such a definition ... does not require the court to engage in an impermissible consideration of the merits of the claims in connection with its class certification determination." *Rendler*, 182 F.R.D. at 160 (quoting 2 *Newberg on Class Actions* at § 6.14) (alterations in original).

By defining the classes as proposed by plaintiffs, with the modifications as stated in § IV.B.1.d, *supra*, the Court will not have to engage in any impermissible consideration of the merits of the claim. Thus, the classes will be defined as follows:

**Class 1—Sheet Class**

All individuals and entities which purchased corrugated sheets in the United States directly from any of the defendants during the class period from October 1, 1993 through November 30, 1995, excluding the defendants, their co-conspirators, and their respective parents, subsidiaries and affiliates, as well as any government entities, and excluding those individuals and entities which purchased corrugated sheets pursuant to contracts in which the purchase price was not tied to the price of linerboard.

**Class 2—Box Class**

All individuals and entities which purchased corrugated containers in the United States directly from any of the defendants during the class period from October 1, 1993 through November 30, 1995, excluding the defendants, their co-conspirators, and their respective parents, subsidiaries and affiliates, as well as any government entities, and excluding those individuals and entities which purchased corrugated containers pursuant to contracts in which the purchase price was not tied to the price of linerboard or containerboard.

## V. CONCLUSION

The Court notes that the certification of a class is not a final order, and the Court retains jurisdiction to modify the class until there is a decision on the merits. *See* Fed. R.Civ.P. 23(c)(2) ("An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits."). "[T]he Committee Notes on Rule 23 envision modification of a class certification 'if, upon fuller development of the facts, the original determination appears unsound.'" *Zenith Labs., Inc. v. Carter–Wallace*, 530 F.2d 508, 512 (3d Cir.1976). As this case proceeds, the Court will examine whether the prerequisites for class certification remain satisfied, and will act accordingly if they are not.

For the foregoing reasons, the Court concludes plaintiffs have satisfied the requirements for class certification and will certify the classes as defined. An appropriate order follows.

### *ORDER*

**AND NOW,** this 4th day of September, 2001, upon consideration of Corrugated Sheet Plaintiffs' Motion for Class Certification (Document No. 76, filed January 11, 2001) and supporting Memorandum of Law (Document No. 74, filed January 10, 2001), and Corrugated Box Plaintiffs' Motion for Class Certification (Document No. 75, filed January 10, 2001), and the related submissions; following oral argument on August 8, 2001, for the reasons set forth in the foregoing Memorandum, **IT IS ORDERED** as follows:

1. The following plaintiff classes, defined as follows, are **CERTIFIED** under Federal Rule of Civil Procedure 23(b)(3):

 a. **Sheet Class**

 All individuals and entities which purchased corrugated sheets in the United States directly from any of the defendants during the class period from October 1, 1993 through November 30, 1995, excluding the defendants, their co-conspirators, and their respective parents, subsidiaries and affiliates, as well as any government entities, and excluding those

individuals or entities which purchased corrugated sheets pursuant to contracts in which the purchase price was not tied to the price of linerboard.

b. **Box Class**

All individuals and entities which purchased corrugated containers in the United States directly from any of the defendants during the class period from October 1, 1993 through November 30, 1995, excluding the defendants, their co-conspirators, and their respective parents, subsidiaries and affiliates, as well as any government entities, and excluding those individuals and entities which purchased corrugated containers pursuant to contracts in which the purchase price was not tied to the price of linerboard or containerboard.

2. Corrugated Sheet Plaintiffs' Motion for Class Certification, with the class defined as above, is **GRANTED**.

3. Corrugated Box Plaintiffs' Motion for Class Certification, with the class defined as above, is **GRANTED**.