## In re MICROCRYSTALLINE CELLULOSE ANTITRUST LITIGATION.

### Master File No. 01–CV–111. MDL No. 1402.

United States District Court, E.D. Pennsylvania.

Aug. 13, 2003.

Anthony J. Bolognese, Bolognese & Associates, LLC, Michael M. Baylson, Duane Morris LLP, Arthur M. Kaplan, Fine, Kaplan & Black, Eric L. Cramer, Berger and Montague, H. Laddie Montague, Jr., Berger & Montague PC, Philadelphia, PC, Bernard Persky, Goodkind, Labaton, Rudoff & Sucharow, Linda P. Nussbaum, Cohen Milstein, Hausfeld & Toll, Robert N. Kaplan, Kaplan & Kilsheimer, New York City, Elizabeth Fegan Hartweg, The Wexler Firm, Chicago, IL, James R. Malone, Nicholas E. Chimicles, Chimicles & Tikellis LLP, Haverford, PA, Joseph Bruckner, Lockridge, Grindal, Nauden, Holsten, PLLP, Minneapolis, MN, Michael Cridin, Hanzman Criden, Chaykin & Rolnick, P.A., Coral Gables, FL, Mila F. Bartos, Finkelstein, Thompson & Loughran, Washington, DC, for Ivax Corporation.

Carolyn H. Feeney, Christine C. Levin, Stephen D. Brown, Tracey R. Gainor, Dechert, Price & Rhoads, Philadelphia, PA, for FMC Corporation.

Francis P. Newell, Philadelphia, PA, Sean D. Corey, Cleary, Gottlieb, Steen & Hamilton, Washington, DC, for Asahi Kaisei.

Ruthanne Gordon, Berger & Montague, P.C., Philadelphia, PA, for Horizon Laboratories, Inc.

David I. Gelfand, Clearly, Gottlieb, Steen & Hamilton, Mark Leddy, Sean D. Corey, Cleary, Gottlieb, Steen & Hamilton, Washington, DC, for Asahi Kasei America, Inc.

Francis P. Newell, Philadelphia, PA, for Asahi Kasei America, Inc.

Ben Furth, Furth Law Firm, for Blue Bell Creameries.

## MEMORANDUM

O'NEILL, District Judge.

Before me is plaintiffs' Motion for Class Certification in this Multi–District Litigation. Upon consideration of the Motion, the vari-

ous memoranda in support and in opposition, and after oral argument, I find that the three proposed classes meet the requirements for class certification under Federal Rule of Civil Procedure 23. Accordingly, plaintiffs' Motion for Class Certification will be granted.

## I. PROCEDURAL HISTORY

The Federal Trade Commission filed a complaint and simultaneously entered into consent decrees with FMC Corporation and Asahi Kasei Company[1] on December 21, 2000. The complaint involved FMC and Asahi's sale of microcrystalline cellulose ("MCC"), a wood cellulose derivative that is used as an inert binding agent in pharmaceutical and vitamin tablets, a suspension agent in liquid pharmaceutical and vitamin formulations, and an additive to improve texture in a variety of food products. See FMC's Mem. of Law in Opposition to Plaintiffs' Motion at 10. The FTC complaint alleged that for over a decade FMC "engaged in a course of conduct designed to neutralize or eliminate competing sellers of MCC and to secure monopoly power" by entering into a conspiracy with Asahi to divide territories. See FTC Analysis to Aid Public Comment on Proposed Consent Agreements between FMC and Asahi, 65 Fed.Reg. 83, 038 (Dec. 29, 2000). The FTC also alleged that FMC invited three smaller MCC producers to join FMC in collusive and anticompetitive conduct. See id. Neither FMC nor Asahi admitted any unlawful action in the consent decrees reached with the FTC. At the class certification hearing, counsel for FMC noted that the FTC had alleged violations of the Federal Trade Commission Act—not the Sherman Act— with respect to the parties' licensing agreements. See Tr. at 67–68 (Civ.A. No. 01–111, No. 58). The consent decrees that FMC and Asahi reached with the FTC have no preclusive effect with respect to the claims alleged in this action.

Following the resolution of the FTC matter, Ivax Corporation, a firm that had purchased MCC products from FMC, filed a complaint against FMC and Asahi alleging federal antitrust violations. See Complaint in Civ. A. No. 01–111 (Doc. No. 1). On February 8, 2001, I issued an Initial Case Management and Scheduling Order authorizing discovery for class certification. On June 22, 2001, the Judicial Panel on Multi–District Litigation transferred two similar cases filed by other MCC purchasers to this District for consolidated pretrial proceedings with Ivax Corporations's case. See In re Microcrystalline Cellulose Antitrust Litig., 149 F.Supp.2d 935 (J.P.M.L.2001).

In accordance with the initial Scheduling Order, Ivax Corporation filed a consolidated amended class action complaint on July 23, 2001. The complaint asserts that in 1984 FMC entered into an unlawful agreement with Asahi to divide the international market for unbranded MCC products. In simple terms, the alleged agreement barred Asahi from selling any MCC products in North America or Europe without FMC's consent and barred FMC from selling MCC products in Asia. Plaintiffs claim that this alleged allocation of the market was an unreasonable restraint of trade in violation of Sections One and Two of the Sherman Act. See 15 U.S.C. §§ 1, 2. The action is brought under Sections 4 and 16 of the Clayton Act, which provide for the private enforcement of the antitrust laws to recover resulting damages. See 15 U.S.C. §§ 15(a), 26. I have jurisdiction pursuant to 28 U.S.C. § 1337.

On August 22, 2001, the Ivax Corporation plaintiffs filed a Motion for Class Certification, which requests that I certify the following three classes:

*Pharmaceutical MCC Direct Purchaser Class*

All persons or entities in the United States who purchased microcrystalline cellulose directly from defendant FMC Corporation in the United States for use in connection with the manufacture or preparation of prescription and/or over-the-counter pharmaceutical products at any time during the period January 1, 1984 through December 31, 1997. The Class excludes governmental entities, defendants, defendants' parents, subsidiaries, and affiliates.

1. Formerly Asahi Chemical Industry Co., Ltd.

*Vitamin MCC Direct Purchaser Class*

All persons or entities in the United States who purchased microcrystalline cellulose directly from defendant FMC Corporation in the United States for use in connection with the manufacture or preparation of vitamin products at any time during the period January 1, 1984 through December 31, 1997. The Class excludes governmental entities, defendants, defendants' parents, subsidiaries, and affiliates.

*Food MCC Direct Purchaser Class*

All persons or entities in the United States who purchased microcrystalline cellulose directly from defendant FMC Corporation in the United States for use as a food additive at any time during the period January 1, 1984 through December 31, 1997. The Class excludes governmental entities, defendants, defendants' parents, subsidiaries, and affiliates.

To resolve several disputes regarding class certification discovery, I appointed Professor James Strazzella as Special Master on January 7, 2002. On June 14, 2002, Special Master Strazzella filed his report resolving the discovery matters. No objection to his report was filed. I issued a revised Scheduling Order on September 5, 2002. In accordance with that Order, defendants filed a Memorandum in Opposition to Plaintiffs' Motion, plaintiffs filed a Reply Memorandum and defendants filed a Surreply Memorandum. Plaintiffs have also submitted expert declarations supporting certification of each of the three classes and defendants have submitted an expert declaration supporting their opposition to class certification, as well as an expert rebuttal declaration. I heard oral argument on March 4, 2003, when counsel for each of the three proposed classes and for FMC and Asahi presented their positions.

## II. BACKGROUND

In the early 1960s, FMC purchased the company that had developed MCC and obtained a patent for the product. *See* Corrected Declaration of Richard Frank at 4. Shortly thereafter, FMC chose Asahi as the exclusive distributor of Avicel®, its brand name of MCC, in Asia. *See* Memo. in Opposi-

tion at 10. FMC also licensed Asahi to manufacture some of its MCC products. The two companies continued to cooperate in marketing Avicel as well as some unbranded MCC products during the 1970s and 1980s. [This portion under seal].

From 1984 to 1997, the relevant class period, FMC sold approximately 50 different MCC products and blends for use in the pharmaceutical, vitamin, and food industries. *See id.* at 13. The two major categories of MCC products are colloidal and non-colloidal. Non-colloidal MCC is used mainly in drug and vitamin tablets and some food products, while colloidal MCC is a blended product used in liquid drug suspensions and emulsions and other food products. In addition to colloidal and non-colloidal formulations, FMC makes specialty grade MCC and various custom blends according to customer specifications. *See id.* at 14–15. Asahi manufactures a number of products that are also made by FMC although, as FMC notes, Asahi does not directly compete with several FMC products, including WC 595 and VE 650. *See id.* at 15. Besides Asahi, FMC's early competition came from two Taiwanese firms, Ming Tai and Wei Ming, and a number of Indian companies. After FMC's patents expired, approximately ten firms entered the MCC market—Heweten, Unitika, Bayer, Cellupharm, Mendell, Blanver, Rettenmaier, Resources Industry, and several small firms in China. At least four of these competitors had exited the market by the early 1990s. *See id.* at 16. By the late 1980s and early 1990s, FMC had lost some of its MCC market share to competitors that had expanded their MCC production, particularly Ming Tai, Mendell, Wei Ming, and Rettenmaier. *Id.* at 17. Competition increased in the mid–1990s as competitors improved the quality of their MCC products and production neared market capacity. *See id.* at 17, citing FMC 9646; FMC 20145.

## III. DISCUSSION

A party seeking class certification bears the burden of proving that the proposed class action satisfies the requirements of Federal Rule of Civil Procedure 23. Plaintiffs must satisfy the four prerequisites of Rule 23(a)

and show that the action can be maintained under at least one of the subsections of Rule 23(b). *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613–14, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Barnes v. American Tobacco Co.,* 161 F.3d 127, 140 (3d Cir.1998).

The Court of Appeals has recognized the utility, and often necessity, of looking beyond the pleadings at the class certification stage of litigation. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 168–69 (3d Cir.2001) ("In reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action."). Accordingly, I have considered not only the pleadings and memoranda, but also the expert declarations and factual support on record. At this stage of the litigation, I need not evaluate competing expert opinions pursuant to Federal Rule of Evidence 702 or the rule of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and I need not assign any one opinion particular weight. *See Nichols v. SmithKline Beecham Corp.,* Civ. A. No. 00–6222, 2003 WL 302352 at *4 (E.D.Pa. Jan.29, 2003) (holding that at the class certification stage a court should only examine whether the expert "has identified a generally accepted methodology for determining impact which is applicable to the class, whether this methodology uses evidence common to all class members, and whether his opinion has probative value"), citing *In re Polypropylene Carpet Antitrust Litig.,* 996 F.Supp. 18, 26 (N.D.Ga.1997); *In re Visa Check/Master-Money Antitrust Litig.,* 280 F.3d 124, 135 (2d Cir.2001), *cert. denied,* 536 U.S. 917, 122 S.Ct. 2382, 153 L.Ed.2d 201 (2002). I have not accepted any particular methodology to quantify antitrust injury, but have considered all the expert opinions with regard to the MCC market and the potential challenges to proceeding as a class action.

## A. The Requirements of Rule 23(a)

Federal Rule of Civil Procedure 23(a) provides:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Commonly referred to as numerosity, commonality, typicality, and adequate representation, these four requirements are "meant to assure both that class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances." *Baby Neal ex rel. Kanter v. Casey,* 43 F.3d 48, 55 (3d Cir.1994). Plaintiffs contend that each of the proposed classes meets all four of the Rule 23(a) prerequisites. In their memoranda opposing class certification, defendants openly challenge only the typicality and commonality requirements.

### 1. Numerosity

■ The number of plaintiffs makes this case appropriate for class certification because joinder would be impracticable. FMC was one of the world's largest manufacturers of MCC, selling it to thousands of pharmaceuticals, vitamins, and food companies across the United States during the proposed class period. *See* Frank at 4, citing FTC Complaint ¶ 6. Defendants do not directly challenge numerosity. I find that the requirement of numerosity of Rule 23(a)(1) is satisfied because there are thousands of geographically-dispersed potential plaintiffs.

### 2. Commonality

■ With respect to the related criteria of commonality and typicality, the Court of Appeals has recognized that courts have "set a low threshold for satisfying both requirements." *Newton,* 259 F.3d at 183, citing *Barnes,* 161 F.3d at 141. The members need not have identical claims to have common legal or factual issues that satisfy commonality. *See Newton* at 182–83. Instead, all that is required is that the litigation involve some common questions and that plaintiffs allege harm under the same legal theory. *See Baby Neal,* 43 F.3d at 58; *In re Flat Glass*

*Antitrust Litig.*, 191 F.R.D. 472, 478 (W.D.Pa.1999) ("[A]llegations concerning the existence, scope and efficacy of an alleged conspiracy present questions adequately common to class members to satisfy the commonality requirement."), citing 4 Hubert Newberg & Alba Conte, *Newberg on Class Actions*, § 18.05–15 (3d ed.1992).

Whether FMC and Asahi entered into an illegal agreement to divide the MCC market is a factual question common to all class members because it is an essential element of proving an antitrust violation. Common legal questions include whether, if such an agreement were reached, FMC and Asahi violated the federal antitrust laws. Defendants' arguments that commonality is not met mirror their challenges to the Rule 23(b)(3) requirement that common questions predominate. Plaintiffs' burden to show the existence of common questions under Rule 23(a)(2), however, is much lower than that of showing the predominance of common questions. *Newton*, 259 F.3d at 187 ("Predominance measures whether the class is sufficiently cohesive to warrant certification. Unlike commonality, predominance is significantly more demanding, requiring more than a common claim."). The presence of some factual differences among plaintiffs, such as the particular harm that each suffered from Asahi's inability to compete, is more properly addressed as it pertains to predominance. The commonality requirement of Rule 23(a)(2) is met because there are several common legal and factual questions related to potential liability.

### 3. Typicality

■ Although they remain distinct requirements, commonality and typicality tend to merge. *See Stewart v. Abraham*, 275 F.3d 220, 227 (3d Cir.2001) ("[B]oth criteria seek to assure that the action can be practically and efficiently maintained and that the interests of the absentees will be fairly and adequately represented."), citing *Baby Neal*, 43 F.3d at 56. To satisfy typicality, plaintiffs must show that the class representatives have legal interests such that pursuit of their own goals will benefit the entire class. Even if there are "pronounced factual differences" among the plaintiffs, typicality is satisfied as long as there is a strong similarity of legal theories and the named plaintiff does not have any unique circumstances. *See Hoxworth v. Blinder, Robinson & Co., Inc.*, 980 F.2d 912, 923 (3d Cir.1992) ("Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the [absent] class members, and if it is based on the same legal theory."); *In re Resource America Sec. Litig.*, 202 F.R.D. 177 (E.D.Pa.2001). In this case, the named plaintiffs enjoy no special circumstances among those companies that bought MCC from FMC during the class period. All members of the putative classes are pursuing the same legal theory of antitrust liability against FMC and Asahi. Plaintiffs satisfy the typicality requirement of Rule 23(a)(3).

### 4. Adequacy of Representation

■ The Court of Appeals has explained that the adequate representation requirement of Rule 23(a)(4) guarantees "that the representatives and their attorneys will competently, responsibly, and vigorously prosecute the suit and that the relationship of the representative parties' interests to those of the class are such that there is not likely to be divergence in viewpoint or goals in the conduct of the suit." *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449 (3d Cir.1977). Counsel for each of the plaintiff classes in this litigation are experienced in antitrust disputes and complex litigation. They have vigorously pursued this action, preparing memoranda, conducting appropriate discovery, and presenting detailed legal and economic analysis in memoranda, expert declarations, and oral arguments. There have been no allegations that counsel have any interests that run counter to those of the plaintiff class. Plaintiffs assert that there is not likely to be a divergence in interests between the class representatives and the class members and no such potential conflicts have been drawn to my attention. Adequate representation under Rule 23(a)(4) is therefore satisfied.

Accordingly, I find that all requirements of Rule 23(a) are satisfied.

## B. The Requirements of Rule 23(b)(3)

In addition to satisfying Rule 23(a), plaintiffs must show that each putative class falls under at least one of the three subsections of Rule 23(b). Plaintiffs claim that the proposed classes qualify under Federal Rule of Civil Procedure 23(b)(3), which provides:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition ... the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum.

The Advisory Committee Note states that this subpart "encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." As an example, the Advisory Committee states that a case involving fraud "perpetrated on numerous persons by the use of similar representations" could be certified under Rule 23(b)(3) even if damages had to be determined individually. In contrast, in a mass accident where both liability and damages would have to assessed individually, the Advisory Committee Note states that plaintiffs probably would not be able to show the predominance of common questions and the superiority of a class action as the method to resolve their claims as required by Rule 23(b)(3). With reference to proposed antitrust class actions the Advisory Committee states, "Private damage claims by numerous individuals arising out of concerted antitrust violations may or may not involve predominating common questions."

## 1. Predominance of Common Questions

■ The Rule 23(b)(3) requirement that common issues predominate insures that a proposed class is "sufficiently cohesive to warrant certification." *Newton*, 259 F.3d at 187. Plaintiffs need not have identical claims to be certified as a class, but if the facts present individual questions these must be outweighed by common ones. The Supreme Court analyzed the predominance requirement in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), *aff'g* 83 F.3d 610 (3d Cir.1996), a proposed class action in which plaintiffs sought damages from asbestos manufacturers. The Court held that while all plaintiffs were exposed to asbestos and shared the goal of reaching a settlement these commonalities did not predominate over individual questions of causation, including each plaintiff's degree of asbestos exposure under different conditions, pre-existing medical conditions, and tobacco use. *See Amchem*, 521 U.S. at 622–25, 117 S.Ct. 2231. The Court distinguished these facts from cases that are properly certified under Rule 23(b)(3):

Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws .... Even mass tort cases arising from a common cause or disaster may, depending on the circumstances, satisfy the predominance requirement.... The Committee's warning, however, continues to call for caution where individual stakes are high and disparities among class members great.

*Id.* at 625, 117 S.Ct. 2231.

Although the *Amchem* Court noted that predominance is readily met in most antitrust cases, if the facts are such that a court must determine antitrust injury for each plaintiff separately, this determination may overwhelm common issues in the litigation. *See Windham v. American Brands, Inc.*, 565 F.2d 59, 68 (4th Cir.1977) ("[W]here the issue of damages and impact ... requires separate minitrials ... courts have found that the staggering problems of logistics thus created make the damage aspect of the case predomi-

nate.") (internal citations omitted). With respect to certification under Rule 23(b)(3), defendants in this case contend that although there are common questions among the various plaintiffs at trial these would be outweighed by disparities among MCC purchasers within each class and the need for an individualized determination of liability and damages. Before considering whether common questions would predominate, it is necessary to identify, at least in general terms, the major legal and factual questions that would be involved in the litigation of this antitrust claim.

The question of FMC and Asahi's liability revolves around Section One of the Sherman Act, which provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal ...." 15 U.S.C. § 1 (1994). Courts have held that the Sherman Act prohibits only unreasonable restraints of trade, encompassing concerted action that is unreasonable *per se* and conduct that violates the "rule of reason." *See Standard Oil Co. v. United States,* 221 U.S. 1, 28, 31 S.Ct. 502, 55 L.Ed. 619 (1911) (limiting Section One to unreasonable restraints of trade); *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 457, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (distinguishing *per se* and "rule of reason" violations). It is a *per se* violation for business entities to enter into an agreement "whose nature and necessary effect are so plainly anti-competitive that no elaborate study of the industry is needed to establish their illegality." *Eichorn v. AT & T Corp.,* 248 F.3d 131, 138 (3d Cir.2001), quoting *Nat'l Soc'y of Prof. Eng'rs v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). *See also Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 289, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (holding that agreements lacking "any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have

caused or the business excuse for their use"). The Supreme Court has acknowledged that market allocation—the geographic division of markets among competitors—is a *per se* violation of the Sherman Act. *See Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46, 49, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (per curiam) ("[A]greements between competitors to allocate territories to minimize competition are illegal"); *United States v. Topco Assoc., Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) ("This Court has reiterated time and time again that '[h]orizontal territorial limitations ... are naked restraints of trade with no purpose other than stifling of competition.' Such limitations are *per se* violations of the Sherman Act.") (internal citations omitted). If plaintiffs cannot identify a *per se* violation, they may prove that there was an unreasonable restraint of trade by showing:

(1) Concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the objects of the conduct pursuant to the concerted action were illegal; and (4) that it was injured as a proximate result of the concerted action.

*Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.,* 998 F.2d 1224, 1229 (3d Cir.1993) (outlining rule of reason test) (internal citations omitted).

Whether FMC and Asahi conspired to allocate the MCC market, and if so, whether this constitutes a *per se* violation, are questions that would be common to all putative class members. If plaintiffs assert a "rule of reason" claim, they will present the common question of whether defendants produced anticompetitive effects in the relevant MCC market, which focuses on defendants' conduct rather than its effect on individual MCC consumers. Whether the alleged *per se* violation or the unreasonable restraint of trade caused plaintiffs antitrust injury and, if so, what damages are due each plaintiff, are questions that are likely to require some degree of individualized inquiry.[2] If the cir-

---

**2.** The Supreme Court has held that even if plaintiffs prove that defendants have committed a *per se* violation of Section 1 of the Sherman Act plaintiffs must show that they have suffered anti-

trust injury in order to prevail on a private claim for damages under Section 4 of the Clayton Act. *See Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 341–42, 110 S.Ct. 1884, 109

cumstances require plaintiffs to prove injury to each MCC buyer separately, class certification under Rule 23(b)(3) may be inappropriate because such individual questions might overwhelm the common question of liability. Therefore, I must consider whether the law permits me to make certain assumptions about the results of defendants' alleged conduct and accept the common proof of injury.

### a. The *Bogosian* Short–Cut

Where anticompetitive behavior artificially raises the price of a product, courts may sometimes presume that all buyers of that product suffer an antitrust injury. The possibility for this presumption was recognized by the Court of Appeals in *Bogosian v. Gulf Oil Corporation,* 561 F.2d 434 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). In *Bogosian,* plaintiffs alleged that Gulf Oil and other companies unlawfully tied gas station leases to contracts to purchase gasoline from the lessor. The district court declined to certify the class and granted summary judgment in favor of those defendants who had not contracted with the named plaintiffs. The Court of Appeals reversed, finding that "when an antitrust violation impacts upon a class of persons who do have standing, there is no reason in doctrine why proof of the impact cannot be made on a common basis so long as the common proof adequately demonstrates some damage to each individual." *Bogosian,* 561 F.2d at 454. The holding that a court may, under some circumstances, accept common proof of injury to every class member has become known in this district as the *"Bogosian* shortcut."

In recognizing this potential presumption of individual injury, the *Bogosian* Court relied on the belief that the anticompetitive

conduct alleged had predictable effects. Although the district court had emphasized the need to calculate individual damages by finding the amount of gasoline that each lessor bought at an above-market price, the Court of Appeals found that the possibility of such a damages calculation did not mean that common issues did not predominate in the overall litigation. *Id.* at 456 ("[T]he necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate."). It explained that some individual differences in injury were not fatal to class certification:

> If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage.

*Bogosian* at 455.

The Court also outlined an alternative course of action if damage calculations became overly complicated:

> If for any reason the district court were to conclude that there would be problems involved in proving damages which would outweigh the advantages of class certification, it should give appropriate consideration to certification of a class limited to the determination of liability. *See* Rule 23(c)(4)(A).

*Id.* (citations omitted).

On remand, the district court certified a class, finding that although there were indi-

L.Ed.2d 333 (1990) (*"Per se* and rule-of-reason analysis are but two methods of determining whether a restraint is 'unreasonable' .... [while] the antitrust injury requirement ... ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place ...."). Antitrust injury is not any economic harm, but harm that is "attributable to an anticompetitive aspect of the practice under scrutiny." *Atlantic Richfield* at 334, 110 S.Ct. 1884. This definition derives from Section 4 of the Clayton Act, which provides in relevant part:

Suits by persons injured. Except as provided in subsection (b) of this section, any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a).

vidual issues on the merits of plaintiffs' claims common issues predominated. *See Bogosian v. Gulf Oil Corp.*, 596 F.Supp. 62, 65 (E.D.Pa.1984).

Two recent Third Circuit cases illustrate the enduring role of *Bogosian* in class certification decisions as well as the limits of its application. In *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, the Court of Appeals held that it could not accept the common proof of injury in a proposed securities class action. The *Newton* plaintiffs claimed that they could have received a better price on many of the securities that they purchased through Merrill Lynch if its brokers had used a private online service to execute orders. After reviewing the evidence offered at the class certification stage, the district court found that the service sometimes produced higher prices than the computer system used by the brokers, but sometimes produced the same or lower prices for various securities. *See In re Merrill Lynch*, 191 F.R.D. 391, 396 (D.N.J.1999). Even if Merrill Lynch brokers breached a duty to securities holders, there was no proof that all plaintiffs in the putative class had lost money as a result and therefore *Bogosian* was inapplicable. The Court of Appeals affirmed, finding that a court may presume individual injury only where there is common proof that illegal conduct harmed the entire class. *Newton*, 259 F.3d at 179 n. 21, citing *Bogosian*, 561 F.2d at 454. The *Newton* Court distinguished the certification of a class action in *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 526 (S.D.N.Y.1996), an antitrust class action in which customers who had purchased securities alleged that dealers had conspired to fix supra-competitive prices. In contrast to the alleged injury in *Newton*, the antitrust injury claim in *In re NASDAQ* "was 'susceptible [to] . . . common classwide proof [because] . . . an illegal price fixing scheme presumptively damages all purchasers of a price-fixed product in an affected market.'" *Newton* at 180 n. 21, quoting *In re NASDAQ* at 526.

The Court of Appeals applied the *Bogosian* short-cut and affirmed certification of a class of antitrust plaintiffs in *In re Linerboard Antitrust Litigation*, 305 F.3d 145 (3d Cir.

2002), *cert. denied, Gaylord Container Corp. v. Garrett Paper, Inc.*, 537 U.S. ——, 123 S.Ct. 1786, 155 L.Ed.2d 666 (2003) (mem.). The allegations in *Linerboard* were that defendants conspired to deplete the nationwide inventory for linerboard—an element of cardboard—in order to implement coordinated price increases on cardboard products. Defendants argued that plaintiffs, buyers of finished cardboard products, could not prove that they would have been injured by a conspiracy to raise the price of linerboard. *See In re Linerboard*, 203 F.R.D. 197 (E.D.Pa. 2001). The district court held that at the class certification stage it did not need to decide whether plaintiffs could prove that the alleged price-fixing of linerboard had a common impact on cardboard buyers, as long as plaintiffs' attempt to prove liability would predominately involve common legal and factual questions. *Id.* at 220, citing *Lumco Indus. v. Jeld–Wen*, Inc., 171 F.R.D. 168 (E.D.Pa.1997).

On appeal, the *Linerboard* defendants argued that the facts of the case were closer to those of *Newton* than *Bogosian* and that "the existence of injury, and hence potential liability, require[d] an inherently individualized inquiry." *Linerboard*, 305 F.3d at 149. The Court of Appeals disagreed with the appellants, finding that the district court properly applied the concept of presumed impact under *Bogosian*. *Id.* at 152–53. The Court also distinguished *Newton* with respect to the ability to make a common proof of impact:

> First, in *Newton* it was clear that not all members of the putative class sustained injuries; here, all members sustained injuries because of the artificially increased prices. Second, in *Newton* there were hundreds of millions of stock transactions involved, thus making the putative class extremely unmanageable; here, an astronomical number of cases is not present. The classes are manageable.

*Id.* at 157.

In reaching its decision, the Court relied on case law, basic economic analysis, and the fact that plaintiffs' experts had "effectively utilized supporting data, including charts and exhibits, to authenticate their professional

opinions that all class members would incur ... damages" from the alleged antitrust violations. *Id.* at 154–55.

### b. Applicability of *Bogosian*

The heart of the class certification dispute in this case is whether I should apply the *Bogosian* short-cut to analyze the antitrust injury caused by the alleged MCC market allocation. If so, the questions whether FMC and Asahi violated the antitrust laws and other common issues would predominate over individual issues, including the degree to which the market allocation injured particular plaintiffs, and the case would be eligible for certification under at least the first part of Rule 23(b)(3). Before I may accept the common proof of injury under *Bogosian*, plaintiffs must establish that if FMC and Asahi did divide the market all class members would have been injured to at least some degree.

Defendants argue that not all class members would necessarily have been injured by allocation of the MCC market between Asahi and FMC. According to defendants, the classes certified in *Bogosian* and *Linerboard* are not analogous because the MCC market allocation would have had a more nuanced and ambiguous impact on prices than the antitrust conduct alleged in those cases. *See* Memo. in Opposition at 8–9. Defendants claim that the facts are closer to *Newton*, where the Court of Appeals affirmed the denial of class certification. Defendants assert that since I cannot accept common proof of injury plaintiffs would have to show that FMC would have charged each class member a lower price for each product if the alleged agreement has not been reached. Plaintiffs will not be able to prove this, defendants continue, in part because Asahi would have found it unprofitable to expand production rapidly and compete with all FMC products sold in the U.S. market. Even if plaintiffs could make such a showing, defendants argue that it would entail an individualized inquiry into damages that would render the litigation ineligible for class certification under the predominance requirement of Rule 23(b)(3).

In their arguments, FMC and Asahi suggest that the *Bogosian* short-cut is only available in price-fixing cases, but this is not persuasive because *Bogosian* was not a paradigmatic price-fixing case. Rather than setting a uniform supracompetitive price, the *Bogosian* defendants entered into a "tie-in" arrangement whereby gas station tenants could not sell any gasoline purchased from sources other than the lessor's licensed trademark. *Bogosian*, 561 F.2d at 439. The Court of Appeals found that if plaintiffs proved a nationwide conspiracy it was reasonable to assume that they might also be able to show that the limits on wholesale gasoline price competition had affected all station lessees to some degree. *Id.* at 454–55. In *Linerboard*, the Court of Appeals affirmed the certification of a class, relying in part on the *Bogosian* short-cut, despite the fact that the case did not involve a simple horizontal price-fixing scheme. *See Linerboard*, 305 F.3d at 150–51. The *Linerboard* plaintiffs had alleged that suppliers restricted linerboard output so that they could increase the prices for linerboard in order to raise the prices of corrugated cardboard sheets and boxes. According to the Court, the laws of economics and plaintiffs' expert opinions were consistent with the assumption that the interference with supply caused prices of the finished product to rise. *Id.* at 152–53. The Court also agreed with the lower court's finding that it was appropriate to use the *Bogosian* short-cut even though defendants had identified some factors that would complicate proof of causation and injury on the merits, such as the relationship between pricing of linerboard and finished cardboard products, the fact that growing demand for cardboard might have also caused increased prices, and that at least one customer had paid less for a cardboard product during the class period. *See Linerboard*, 203 F.R.D. at 219–20.

I recognize that the proposed class action against FMC and Asahi does not involve a simple price-fixing scheme, but as *Bogosian* and *Linerboard* show that this is not a prerequisite for allowing the common proof of impact. Although the propriety of accepting common proof of injury must be analyzed on a case-by-case basis and market allocation may have less direct consequences on prices

than price-fixing or other antitrust schemes, basic economic theory predicts that the artificial absence of competition leads to less competitive prices. A firm creates barriers to market entry, such as exclusion of a competitor from a territory, in order to secure market power and charge prices above the prevailing market price under competitive conditions. This is one of the primary reasons that market allocation, like price-fixing, is considered a *per se* Sherman Act violation. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) ("Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal *per se* without inquiry into the harm it has actually caused."), citing *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *United States v. Heffernan*, 43 F.3d 1144, 1145–46 (7th Cir.1994) (Posner, C.J.) ("[T]he core *per se* offenses that no (well, very few) economists believe can be justified ... are comprised of 'restrictive agreements among competitors, such as ... horizontal market-allocation.'"), citing Joseph C. Gallo et al., *Criminal Penalties under the Sherman Act: A Study of Law & Economics*, 16 Res. in L. & Econ. 25 (1994). The Supreme Court has held that market allocation is "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other." *Palmer*, 498 U.S. at 49–50, 111 S.Ct. 401. The fact that the *Palmer* Court found that excluding even a potential competitor creates a predictable enough effect to constitute a *per se* violation of the Sherman Act is relevant to the instant case in that it supports plaintiffs' theory that the mere knowledge that Asahi would not compete in the United States led FMC to raise its prices.

The Court of Appeals' decision not to certify the proposed securities class action in *Newton* does not control the instant case because the two sets of facts are distinguishable. In *Newton*, there was clear evidence that some of the plaintiffs were not injured by the alleged breach of duty in that they received the same or a better price for their securities under the existing Merrill Lynch pricing system. *Newton*, 259 F.3d at 178–79. In contrast, there is no evidence that some FMC customers were better off because of Asahi's absence, only questions about the extent to which Asahi's entry would have affected different customers and assertions by defendants that several customers would not have benefitted. The securities claims presented in *Newton* involved hundreds of millions of transactions and economic injury from each transaction depended on whether the broker could have gotten a better price and whether circumstances and market conditions would have allowed the transaction in the time necessary to reap the price differential. *Newton* at 187, 190. Although there are unknown factors in the MCC litigation, the evidence presented thus far suggests that plaintiffs may be able to prove common impact despite some variation in antitrust injury and the case involves significantly fewer transactions than *Newton*.

In addition to the analogies to case law, defendants argue that I should not apply the *Bogosian* shortcut because the absence of Asahi as a competitor in this country would not have a predictable effect on prices. This is because, according to defendants, there are many unknown variables such as (1) which products Asahi would have manufactured during the class period had it been free to do so and (2) the extent to which Asahi could have offered prices below those of FMC given existing competition and MCC substitutes. With respect to the first variable, defendants assert that Asahi might not entered the market and competed with every FMC product sold in the U.S. because it may not have had the capacity to expand production or the economic incentive to compete with products that were either custom blends or had low profit margins. During the class period, some FMC products faced price competition from other MCC manufacturers and from MCC substitutes, especially in the food market, which may have made market entry less attractive for Asahi. *See* Decl. of Peter R. Greenhalgh at 12.

At least one expert, however, found that indirect competition from MCC substitutes in food products did not curtail FMC's monopo-

ly pricing during the relevant period. *See* Decl. of Douglas F. Greer in Support of Plaintiff's Reply Brief at 4. This is preliminary support for plaintiffs' argument that there was an incentive for Asahi to enter the market. Dr. Greer also points out that if a consumer did switch to a MCC substitute during the class period the loss of monopoly profits to FMC would not be included in any damage calculation that ultimately results from this class action. *See* Greer at 15–16. Although Asahi would have had to develop several new products and expand its marketing and distribution systems, plaintiffs make a strong argument that they will be able to prove that Asahi would have competed for all of FMC's customers during the class period had it been allowed to do so. Dr. Beyer, the expert for the vitamins class, notes that the bulk of MCC sales in the United States were from three grades, two of which Asahi produced when the class period began. *See* Decl. of John C. Beyer Regarding Economic Issues of Class Certification at 8. At the class certification hearing, counsel for the pharmaceutical class explained that of the fourteen pharmaceutical products in question two of these products made up 92% in sales, indicating that influential competition from Asahi would not have been so difficult to establish. *See* Tr. at 101–02. Dr. Greer points out that the alleged agreement would have prevented Asahi from selling not only specific MCC blends to existing FMC customers, but also bulk MCC to other U.S. companies who would have processed the bulk MCC to create various blends and compete with most FMC products. *See* Greer at 14. Therefore, Asahi's exclusion would have affected prices for all MCC products, regardless of which products they chose to manufacture themselves. Furthermore, if there is evidence that Asahi would not have manufactured certain MCC products for which FMC only generated a few thousand dollars in sales, reached only a few customers, or were facing

very low demand during the class period given non-MCC substitutes, the appropriate measure is to redefine the classes to exclude the customers who purchased these products from MCC.[3]

Numerous documents, most of which were prepared during negotiations of the various licensing agreements between the two companies, show that FMC considered Asahi a more viable competitor than other MCC manufacturers because Asahi had shared FMC's manufacturing technology and marketed Avicel outside the United States. This would suggest that FMC was confident in Asahi's ability to expand and compete with at least some FMC products in the United States market. *See, e.g.,* Plaintiff's Reply Mem. Ex. 5 (FMC2 010084) (quoting FMC as stating that Asahi is one of its more formidable current and potential competitors because "[t]hey know our process, they use our pulp and in some ways (specifically speck count), their product is superior"). At the class certification hearing, defendants' counsel argued that most of these documents supporting the position that Asahi was a real threat to FMC's market position are irrelevant to the instant class certification issue because the documents came from internal discussions at FMC preceding its legitimate renegotiation of the Asahi trademark licensing agreement. *See* Tr. at 65–66. Although these documents must be reviewed carefully before accepting them as evidence supporting the merits of plaintiffs' antitrust claims, it is clear that they are relevant for purposes of establishing that FMC recognized and considered Asahi's capacity and incentives to expand MCC sales worldwide.

With respect to the second variable affecting the ability to predict how Asahi's absence affected plaintiffs, defendants argue that I cannot presume that FMC would have lowered its prices or that FMC customers would have switched to a competing Asahi product

---

3. *See* FMC Corporation's Surreply at 1 (arguing that RC501NF, FD109, BK2130, DS31020, VE-650, and HD–012 are FMC products that Asahi would not have produced or strongly competed against had it entered the U.S. market). Asahi never produced competing products for FMC vitamin products VE500 and VE650, food products FD100 and WC595, and pharmaceutical

products PH103NF, PH200NF, and CE15NF. Asahi did not make products that would compete against VE050 and VE090 until 1998 or products that would compete against RCN10, RCN15, or CG200 until 2001. The fact that Asahi did develop these products later add support to plaintiffs' assertion that Asahi was technically capable of manufacturing these MCC grades and products.

that was priced lower. FMC states that brand loyalty to FMC, due to its strong reputation for quality and customer service, would complicate any assessment of the impact a competitor would have had on the overall prices of MCC products. If brand loyalty was so high that FMC would not have been forced to lower its prices had Asahi entered the market with lower-priced products, then not all customers were injured by Asahi's absence. As support for this contention, Dr. Greenhalgh points to evidence that when other competitors entered the market FMC did not respond by lowering prices. *See* Greenhalgh at 14.

Although brand loyalty might have delayed or prevented a switch to a lower priced competitor for a few customers, it goes against the most basic precepts of economics to argue that, in general, consumers of a product would not take advantage of a lower priced alternative. As Dr. Greer points out, brand loyalty was also artificially enhanced by excluding Asahi from advertising or marketing in North America. *See* Greer at 19. Greer also provides evidence that recent competitive developments in the MCC market have pushed some of FMC's prices downward, adding legitimacy to plaintiffs' position that they will be able to prove that FMC charged supracompetitive prices during the class period. *See id.* at 26 (discussing impact of Blanver's entry into the U.S. market on prices for MCC used in the food industry). Dr. Greer calculated that in the 1990s FMC raised prices for several MCC products by as much as 48%. *See id.* at 9. Dr. Beyer found that because MCC suppliers have a nationwide presence, most vitamin companies that purchased MCC from FMC would have benefitted from the competition of another supplier such as Asahi. *See* Beyer at 10. Beyer also found that prices for most MCC products behaved similarly over time; therefore, any factor influencing price would affect prices for all MCC products. *See id.* at 10–12. Plaintiffs' expert Arthur M. Havenner concurred, finding that "[e]ven though various food MCC products sell for different average prices and there are quantity discounts to some buyers, formal statistical analysis shows that the prices in this narrow segment of the economy move together close-

ly." Decl. of Arthur R. Havenner in Support of Plaintiffs' Reply Brief at 2. Plaintiffs' experts provide information that roughly resembles the type of evidence discussed by the *Linerboard* Court to determine antitrust injury, i.e., multiple regression analysis, the "yardstick approach," and analysis of the pricing structure of the industry.

Defendants also contend that some MCC buyers in the pharmaceutical industry might not have switched from FMC products to a lower-priced MCC product from Asahi because of regulatory costs. *See* Memo. in Opposition at 19–20. Under some circumstances, the FDA would require pharmaceutical manufacturers to test every product made with MCC if the manufacturer switched to another MCC brand. Such testing costs might have outweighed any cost savings that would have resulted from plaintiffs switching from existing FMC products to lower-priced MCC products from Asahi. Richard Frank, plaintiffs' expert for the Pharmaceutical Class, provides evidence that all MCC buyers in the pharmaceutical class were injured by Asahi's competition, despite any regulatory costs or brand loyalty that may have made pharmaceutical companies less likely to switch suppliers. According to Frank, FMC and Asahi comprised between 70 and 75% of the worldwide share of pharmaceutical MCC for the 1990's, which put them in a position to affect competition and prices worldwide. *See Frank* at 10–11. Because FMC and Asahi both produced the two most popular MCC pharmaceutical products, PH101NF and PH102NF, during the class period, Asahi's exclusion from the American market would impact prices, despite any costs of switching products. *See id.* at 6.

The bulk of the evidence presented in opposition to class certification attempts to convince me that there are enough complications in the MCC market that I should not expect the market to behave as a simplified economic model would predict, that is, that with increased competition resulting from removal of a barrier to entry prices would go down. Antitrust cases nearly always require some speculation as to what would have happened under competitive conditions, to estimate the damage done by restraints on trade or other

collusion, but this is not fatal to class certification. *See In re Fine Paper Antitrust Litig.*, 82 F.R.D. 143, 151–52 (E.D.Pa.1979) (noting that diversity of product, marketing practices, and pricing have not been fatal to class certification in numerous cases where conspiracy is "the overriding predominant question"), citing *In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727, 734 (N.D.Ill.1977); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 263 (D.D.C.2002) ("[C]ourts have found common impact in cases alleging price-fixing despite individual negotiations, varied purchase methods and different amounts, prices, and types of products purchased . . ."); *In re Mercedes–Benz Antitrust Litig.*, 213 F.R.D. 180, 187 (D.N.J.2003) ("Antitrust defendants resisting class certification routinely argue that the complexity of their particular industry make it impossible for common proofs to predominate on the issue of antitrust impact . . . ." but the argument is "usually rejected where the conspiracy issue is the overriding one.") (internal citations omitted). Although the extent to which existing competition, brand loyalty, and regulatory costs would have reduced the extent of price competition between FMC and Asahi will clearly be disputed issues in the merits stage of this litigation, I am satisfied that the effects of exclusion of Asahi from the United States market would be predictable enough to accept the common proof of injury within each class. Asahi may not have manufactured all the products that FMC marketed in this country, but it produced high-quality MCC products that corresponded to many of FMC's top-sellers. *See* Plaintiff's Mem. in Further Support at 4. The alleged market allocation agreement would have provided FMC with at least the opportunity to raise prices for most of its products and defendants have not presented any conclusive evidence why this would not have occurred. The evidence presented as this litigation continues may or may not support plaintiffs' position that Asahi was capable of manufacturing all types of competing products and that it would have been economically advantageous for it do so, but the *Bogosian* short-cut is applicable at this stage. The three classes satisfy the predominance requirement of Federal Rule of Civil Procedure 23(b)(3).

### 2. Superiority

The requirement that a class action be the superior method of resolving the claims insures that there is no other available method of handling the litigation which has greater practical advantages. *See* Fed. R.Civ.P. 23, Advisory Committee Note, 1966 Amendment to 23(b)(3). In considering superiority, I may consider alternatives to class certification, such as holding separate trials with combined discovery or certifying the class with respect to liability, but not damages. The superior nature of the class action is closely related to the predominance requirement because "only where predominance exists do the economies of scale justify aggregating claims in a class action." *In re Mercedes–Benz Antitrust Litig.*, 213 F.R.D. at 186 (citations omitted). With the nationwide dispersal of thousands of MCC buyers in the food, vitamin, and pharmaceutical industries, each with a similar antitrust claim against FMC and Asahi, the class action is the most fair and efficient method of adjudication.

### IV. CONCLUSION

An examination of the merits of the claims after discovery is complete may show that the market would not have behaved in the manner predicted by plaintiffs and their experts, at least not predictably enough to find that MCC buyers were injured by FMC's alleged attempts to prevent Asahi from competing for U.S. customers. Whether some MCC buyers within each class were not injured or were injured to a lesser extent, if plaintiffs are successful in proving a market allocation, is a factual issue to resolve at trial. I may need to consider subclasses to deal with variations within each class. Plaintiffs, however, have set forth sufficient evidence and a plausible theory to show they may be able to prove by class-wide evidence that Asahi's artificial absence from the U.S. market did impact all buyers of MCC. The Court of Appeals has held that if there are doubts at the certification stage those uncertainties should be resolved in favor of certifying the class. *See Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.1985), *cert. denied,* 474 U.S.

946, 106 S.Ct. 342, 343, 88 L.Ed.2d 290 (1985). The proposed classes satisfy the standards for class certification under Federal Rule of Civil Procedure 23, meeting the requirements of numerosity, commonality, typicality, adequate representation, predominance of common questions, and superiority of the class action as compared to other available methods. I will certify three classes. An appropriate Order follows.

## ORDER

**AND NOW**, this day of August, 2003, upon consideration of plaintiffs' Motion for Class Certification, the supporting and opposing memoranda of law, expert declarations, and after oral argument, I find that the requirements of Rule 23(a) and Rule 23(b)(3) are met and therefore it is hereby **ORDERED** that the Motion is **GRANTED** as follows:

1. The Vitamin Class is defined as: All persons or entities in the United States who purchased microcrystalline cellulose directly from defendant FMC Corporation in the United States for use in connection with the manufacture or preparation of vitamin products at any time during the period January 1, 1984 through December 31, 1997. The Class excludes governmental entities, defendants, defendants' parents, subsidiaries, and affiliates.

2. The Pharmaceutical Class is defined as: All persons or entities in the United States who purchased microcrystalline cellulose directly from defendant FMC Corporation in the United States for use in connection with the manufacture or preparation of prescription and/or over-the-counter pharmaceutical products at any time during the period January 1, 1984 through December 31, 1997. The Class excludes governmental entities, defendants, defendants' parents, subsidiaries, and affiliates.

3. The Food Purchasers Class is defined as: All persons or entities in the United States who purchased microcrystalline cellulose directly from defendant FMC Corporation in the United States for use as a food additive at any time during the period January 1, 1984 through December 31, 1997. The Class excludes governmental entities, defen-

dants, defendants' parents, subsidiaries, and affiliates.

4. This Order is conditional and without prejudice to any party's right to move to alter, amend, or decertify these classes or to raise issues concerning the classes. *See* Fed. R.Civ.P. 23(c)(1).